**Congressman Ronald V. DELLUMS, et al., Petitioners,**

v.

**U.S. NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,**

**Advanced Nuclear Fuels Corporation, Intervenors.**

No. 87–1531.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 3, 1988.

Decided Dec. 16, 1988.

Duane K. Thompson, with whom Stuart J. Land, Evan T. Bloom, Jonathan S. Berck, William L. Robinson and Eldon V.C. Greenberg, Washington, D.C., were on the brief, for petitioners.

John F. Daly, Atty., Dept. of Justice, and Rochelle M. Gunner, Atty., U.S. Nuclear Regulatory Com'n, with whom John R. Bolton, Asst. Atty. Gen., William H. Briggs, Jr., Sol., U.S. Nuclear Regulatory Com'n, E. Leo Slaggie, Deputy Sol., U.S. Nuclear Regulatory Com'n, and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the joint brief for respondents. Richard K. Willard, Asst. Atty. Gen.,* William Kanter, Atty., Dept. of Justice, and C. Sebastian Aloot, Atty., Nuclear Regulatory

_____

* At the time the brief was filed.

Com'n, Washington, D.C., also entered appearances for respondents.

Harry H. Voigt, Leonard M. Trosten, Mindy A. Buren and Paul H. Falon, Washington, D.C., were on the brief for intervenor Advanced Nuclear Fuels Corp.

Before RUTH BADER GINSBURG and SILBERMAN, Circuit Judges, and MILTON POLLACK,[**] Senior District Judge, United States District Court for the Southern District of New York.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring opinion filed by Senior District Judge MILTON POLLACK.

Opinion dissenting as to standing filed by Circuit Judge RUTH BADER GINSBURG.

SILBERMAN, Circuit Judge:

■ This is a petition for review of two final orders of the United States Nuclear Regulatory Commission ("NRC" or "Commission") that grant and decline to revoke, respectively, licenses to import uranium hexafluoride from South Africa. Petitioners, which include several members of Congress,[1] three organizations opposed to apartheid and one concerned with nuclear proliferation,[2] an exiled black South African anti-apartheid activist named Henry Isaacs, and an unemployed American uranium miner named Robert Chavez,[3] contend that these orders are contrary to provisions of the Comprehensive Anti-Apartheid Act of 1986, 22 U.S.C. § 5001, et seq.

(Supp. IV 1986), and, therefore, not in accordance with law. 5 U.S.C. § 706(2)(A) (1982). We conclude, however, that none of the petitioners has standing to maintain this suit, and we therefore dismiss the petition for review.

### I.

On October 2, 1986, Congress passed the Comprehensive Anti-Apartheid Act of 1986 over the President's veto. The stated purpose of the Act is "to set forth a comprehensive and complete framework to guide the efforts of the United States in helping to bring an end to apartheid in South Africa and lead to the establishment of a nonracial, democratic form of government." 22 U.S.C. § 5002. In order to register the United States' disapproval with the South African government and to pressure that government to negotiate about the dismantlement of apartheid, Congress included in the Act a series of economic sanctions against South Africa. Congress rejected a total trade embargo and instead imposed limited sanctions that, *inter alia*, minimized the potential adverse impacts on the United States economy. At issue in this case is one such provision, section 309 of the Act, 22 U.S.C. § 5059, which prohibits the importation of uranium, coal, and textiles from South Africa. That section states:

Notwithstanding any other provision of law, no—

 (1) uranium ore,

 (2) uranium oxide,

 (3) coal, or

---

[**] Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

1. The Members of Congress are Representatives Ronald V. Dellums, Merwyn M. Dynally, William H. Gray, III, Edward J. Markey, Charles B. Rangel, Bill Richardson, and Howard Wolpe. Petitioners do not advance an argument that Representative Dellums and the other Members of Congress have standing to sue. We have held that Members of Congress do not have standing in cases like this where the Members have not alleged an injury that is " 'specific and cognizable,' arising out of an interest 'positively identified by the Constitution.' " *United Presbyterian Church v. Reagan,* 738 F.2d 1375, 1381 (D.C.Cir. 1984).

2. The organizational petitioners, respectively, are the American Committee on Africa, TransAfrica, Inc., The Washington Office on Africa, and The Nuclear Control Institute.

3. The original motion to intervene before the NRC was filed by the Members of Congress, the four organizations concerned with the problems of apartheid or nuclear proliferation, and a labor union, which is not a party to this petition. Subsequently, that group successfully sought to add three individual petitioners—the exiled South African, the unemployed American uranium miner, and a New Mexico state senator, who is no longer a party.

(4) textiles,

that are produced or manufactured in South Africa may be imported into the United States.

22 U.S.C. § 5059(a).

All parties wishing to import uranium must receive a license from the NRC. 42 U.S.C. § 2092. In June 1987, the Commission granted petitioners leave to intervene in eight license proceedings before the NRC involving applications to import South African uranium hexafluoride. Petitioners also filed a separate petition seeking the revocation of eleven licenses to import uranium hexafluoride, which had been granted prior to the effective date of the Anti-Apartheid Act. The NRC issued two final orders on September 21, 1987, one covering the license application proceeding and the other covering the license revocation proceeding. 26 N.R.C. 109 (1987); 26 N.R.C. 123 (1987). The Commission determined that while section 309 prohibits the importation of uranium ore and uranium oxide, it does not extend the ban to other forms of uranium, such as uranium hexafluoride.[4]

## II.

Three standing requirements are derived from Article III of the Constitution. A plaintiff or petitioner must show that he has personally suffered a "distinct and palpable" harm that constitutes injury in fact, *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), that the injury "fairly can be traced to the challenged action," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976), and that the injury is "likely to be redressed by a favorable decision." *Id.* at 38, 96 S.Ct. at 1924. The latter two requirements of "causation" and "redressability" are often treated interchangeably by the Supreme Court, and we have recognized that they tend to merge in cases such as this one where the relief sought is only the cessation of the allegedly illegal conduct. *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 5 (D.C.Cir.1988); *National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C.Cir.1988).

Despite this analytical framework, the guidance discernible from decisions of the Supreme Court on standing is less than pellucid. The Court has often imposed a heavy burden on plaintiffs to show a "substantial likelihood" that the relief sought would redress the alleged injury, *see, e.g., Simon*, 426 U.S. at 44–46, 96 S.Ct. at 1927–28, but on other occasions it has appeared to think that standing could be based on assertions of what one might consider an attenuated line of causation. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973).[5] *Cf. Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 77, 98 S.Ct. 2620, 2632, 57 L.Ed.2d 595 (1978) (affirming conclusion that there was "substantial likelihood" of indirect causa-

---

**4.** Section 601 of the Act gives the President authority "to issue such rules, regulations, licenses, and orders as are necessary to carry out the provisions" of the Act. 22 U.S.C. § 5111. In Executive Order 12571, the President delegated the responsibility for implementing section 309 to the Department of the Treasury. In March 1987, the Department issued a regulation saying:

Articles such as uranium hexafluoride, which are produced from uranium ore or uranium oxide and which the U.S. Customs Service determines to have been substantially transformed outside the United States, are not subject to the import prohibition. . . .

31 C.F.R. § 545.425 (1987).

**5.** It has been suggested that the procedural posture of *SCRAP* explains any potential inconsistency between it and other standing decisions. The holding in *SCRAP* was that the allegations

of injury were sufficient to survive a *motion to dismiss,* but not necessarily a motion for summary judgment. 412 U.S. at 689 & n. 15, 93 S.Ct. at 2417 & n. 15. But the Court has imposed the burden to show "substantial likelihood" of redressability on other plaintiffs presented with motions to dismiss. *See Allen v. Wright*, 468 U.S. 737, 748, 751, 104 S.Ct. 3315, 3323, 3324, 82 L.Ed.2d 556 (1984); *Simon*, 426 U.S. at 45 n. 25, 96 S.Ct. at 1927 n. 25. The question of causation or redressability, in the context of a standing challenge, usually is an issue of predictive fact. As such, it is not at all clear to us that it should or can be treated as an historical fact (as in *SCRAP*). Predictive facts seem technically more like mixed questions of law and fact (as in *Allen*). Perhaps more accurately, as we show below, they involve as much policy as law.

tion, because district court was not clearly erroneous). The Court has declared that widely-held, non-quantifiable aesthetic and environmental injuries are sufficient to satisfy the Article III minimum, *Sierra Club v. Morton*, 405 U.S. 727, 734–41, 92 S.Ct. 1361, 1365–69, 31 L.Ed.2d 636 (1972), *United States v. SCRAP*, 412 U.S. at 687–89, 93 S.Ct. at 2415–17, *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986), but it has found no standing when the only injury alleged is widely-held, non-quantifiable and of a political or ideological nature. *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216–27, 94 S.Ct. 2925, 2929–35, 41 L.Ed.2d 706 (1974). Although the Court has said that "standing concepts have gained considerable definition from developing case law," *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3323, 82 L.Ed.2d 556 (1984), we still struggle to interpret this puzzling—if not irreconcilable—precedent.

### III.

#### A. *The Organizational Petitioners*

 The four organizational petitioners in this case allege that they have standing to maintain this appeal because they represent members who are adversely affected by any weakening of the enforcement of the Anti–Apartheid Act. To satisfy standing requirements, an organization must show that "(a) its members would otherwise have standing to sue in their own right, (b) the interests that it seeks to protect are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

Three of the four organizational petitioners make no attempt, however, to describe an individualized injury of the members of the organizations. It is clear that mere "interest in a problem" coupled with unfa-

vorable government action is not sufficient to meet the injury in fact requirement of Article III. *Capital Legal Foundation v. Commodity Credit Corp.*, 711 F.2d 253, 258 (D.C.Cir.1983); *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). Petitioner Nuclear Control Institute has alleged no particularized injury to its members. The interest of both the organization and its members in this litigation is only the generalized goal of "opposing nuclear proliferation and ensuring proper safeguards for nuclear energy." Even assuming the NRC's orders would adversely affect the Institute's general interest, this court has consistently held that harm to an interest in " 'seeing' the law obeyed or a social goal furthered" does not constitute injury in fact. *See, e.g., American Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C.Cir.1987).

Two other organizational petitioners— the American Committee on Africa and The Washington Office on Africa—are interested primarily in promoting change in the racial policies of the South African government. Again, while all of the members of these organizations have a "sincere, vigorous interest in the action challenged," *Capital Legal Foundation*, 711 F.2d at 258, they have not alleged a "distinct and palpable harm" that will satisfy the injury-in-fact requirement. Petitioners allege that the members have suffered injury "at least equivalent" to those found sufficient in *Japan Whaling Ass'n*, 478 U.S. at 230 n. 4, 106 S.Ct. at 2866 n. 4, and *Animal Welfare Institute v. Kreps*, 561 F.2d 1002, 1007–08 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978). In those cases, however, the plaintiffs alleged an injury to the participatory activity of the groups' members. In *Japan Whaling*, the Court noted that the "whale watching and studying" of the members of the American Cetacean Society would be "adversely affected by continuing whale harvesting." 478 U.S. at 230 n. 4, 106 S.Ct. at 2866 n. 4. Similarly, in *Kreps*, the appellants alleged injury to the "recreational, aesthetic, scientific, and educational interests of their members." 561 F.2d at 1007. In this case,

the principal purpose of the organizations is either political or ideological in nature, and the Court has consistently rejected claims of standing predicated solely on " 'the right, possessed by every citizen, to require that the Government be administered according to law.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 483, 102 S.Ct. 752, 764, 70 L.Ed.2d 700 (1982) (quoting *Fairchild v. Hughes,* 258 U.S. 126, 129, 42 S.Ct. 274, 275, 66 L.Ed. 499 (1922) (citation omitted)).

■ Petitioners do allege that Randall Robinson of TransAfrica, Inc. has suffered concrete injury because he is "effectively banned from entering South Africa." This injury satisfies the injury-in-fact requirement. The causation analysis for Robinson and TransAfrica is identical to that of petitioner Isaacs, who also is unable to travel to South Africa. *See infra,* at 974–80. For the reasons stated below, we conclude that TransAfrica does not have standing.

### B. *Petitioner Robert Chavez*

■ Robert Chavez is an unemployed uranium miner. He contends that the adverse impact of foreign uranium imports on the domestic market caused him to be laid off from his mining job in New Mexico in 1985. And, Chavez alleges that the NRC's granting of licenses to import uranium hexafluoride will reduce demand for domestic uranium and thereby diminish his chances of regaining employment.

Although Chavez's inability to find work in the mining industry constitutes injury in fact, we think he has not satisfied the causation and redressability requirements of Article III. Petitioners must show a "substantial likelihood" that a ban on the importation of uranium hexafluoride from South Africa would redress Chavez's injury by resulting in an employment opportunity for him. *See Simon,* 426 U.S. at 44–46, 96 S.Ct. at 1927–28. To be sure, the indirect nature of Chavez's alleged injury does not necessarily preclude standing, because the focus is not on "the length of the chain of causation, but on the plausibility of the links that comprise the chain." *Public Cit-*

*izen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 717 n. 31 (D.C.Cir.1977). Nevertheless, the indirectness of the injury alleged "may make it substantially more difficult to meet the minimum requirement of Article III." *Warth,* 422 U.S. at 505, 95 S.Ct. at 2208.

Chavez essentially asks us to make three sequential inferences to support his claimed causal nexus: (1) a ban on the importation of South African uranium hexafluoride would increase the demand for domestic uranium; (2) this increased demand would lead to more employment opportunities for uranium miners in America; and (3) these increased employment opportunities would enable Chavez to secure a job in New Mexico. This chain of inferences seems to us much too frail to establish the requisite substantial likelihood that Chavez's injury would be remedied by a reversal of the NRC's decisions.

The condition of the United States uranium industry has been dismal in the late 1970s and 1980s. *See Huffman v. Western Nuclear, Inc.,* —— U.S. ——, 108 S.Ct. 2087, 2089–90, 100 L.Ed.2d 693 (1988). The decline in the industry has been attributed to cancellations and delays in the construction of domestic nuclear reactors and to other developments in the national and international markets. *Id.* 108 S.Ct. at 2089. The Department of Energy has concluded that "[s]tructural weakness, not foreign competition, are the reasons for the depressed state of the domestic uranium industry." *Uranium Enrichment Services Criteria,* 51 Fed.Reg. at 27,135 (July 29, 1986). The market price of uranium, at least in 1986, was "well below the conventional United States producers' average cost of production." *See Huffman,* 108 S.Ct. at 2089 n. 5.

Petitioners make no claim that the market opening created by a ban on the importation of South African uranium hexafluoride would not merely be absorbed by other foreign suppliers of uranium hexafluoride. Nor have they sought to demonstrate that an increase in demand for domestic uranium—if it resulted—would be sufficient in magnitude to make domestic processing

profitable. A favorable change in economic incentives alone, without an additional showing that the change will be likely to redress the alleged injury, is not sufficient to establish the required causal nexus. *Allen*, 468 U.S. at 758, 104 S.Ct. at 3328. Finally, even if we were to infer that banning the importation of uranium hexafluoride would favorably affect the domestic uranium industry as a whole, petitioners have not shown a substantial likelihood that the revival would occur in New Mexico and that it would benefit Chavez if it did.

The string of tenuous inferences that petitioners have offered simply does not demonstrate the causal nexus between Chavez's injury and the NRC's orders. Petitioners are correct to insist that they need not demonstrate to a certainty that the requested relief would result in a future job for Chavez. It is beyond debate, however, that petitioners must show that such result is substantially likely. *Cf. Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C.Cir. 1984) ("highly likely" that exclusion of foreign flag shippers from domestic market would result in increased use of domestic carriers and more jobs for union members).[6]

## C. *Petitioners Henry Isaacs* ***

■ Henry Isaacs is a black South African who was forced into exile by the South African government due to his active opposition to apartheid. Because the NRC's orders allegedly blunted the effectiveness of the Anti–Apartheid Act, which was designed to help bring an end to apartheid, Isaacs contends that the NRC has caused his continuing injury. Although Isaacs' inability to return home without facing arrest and prosecution satisfies the injury-in-fact requirement, we nevertheless believe that Isaacs has failed to meet his burden of demonstrating causation and redressability.

The purpose of the Anti–Apartheid Act, as we noted, is "to set forth a comprehensive and complete framework to guide the efforts of the United States in helping to bring an end to apartheid in South Africa and lead to the establishment of a non-racial, democratic form of government." 22 U.S.C. § 5002. Petitioners are somewhat unclear in their briefs, however, whether Isaacs' injury can be redressed only by complete democratization in South Africa or whether less dramatic reforms could remedy his injury. Although most of their argument addresses the potential that the sanctions will lead to democratization, petitioners also suggest that several other goals of the Act short of ending apartheid —including a repeal of the state of emergency, recognition of the right to organize political parties, and commencement of good faith negotiations with black South Africans about the future of that country's political system—would redress Isaacs' injury. *See* 22 U.S.C. § 5011.

Petitioners claim rather opaquely that these intermediate actions by the South African government "would directly benefit Mr. Isaacs in the near term." But there is no concrete allegation that any intermediate step would lead to relief for Isaacs. We are asked to infer that favorable political developments in South Africa will result in some undefined relief for Isaacs. Without a more specific contention by petitioners, it is impossible for us to foresee whether incremental forward-looking reforms— short of complete democratization and an end to apartheid—would benefit Isaacs, who is subject to arrest for his past illegal conduct. We, unlike the dissent, do not

---

**6.** Even had petitioners established the requisite causal nexus, we would be faced with a substantial question whether Chavez fails to pass one of the Supreme Court's prudential limits on standing because his injury does not fall within "the zone of interests to be protected or regulated by the statute ... in question." *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Although we need not reach that question, we note that the government argues with some

force that Chavez's interests are "so marginally related to ... the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Industry Association*, 479 U.S. 388, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987).

*** This analysis also applies to petitioner Trans-Africa, Inc. and its member, Randall Robinson. *See supra* at 973.

think it appropriate for a federal court to construct for petitioners a "plausible" scenario whereby an order of this court might provide relief for injuries not specifically pleaded. *See* Dissent at 985; *compare Center for Auto Safety v. Thomas,* 847 F.2d 843, 849–50 (D.C.Cir.1988) (opinion of Wald, C.J.) (extrapolating from claim that EPA action resulted in cars that "save less energy" to formulate allegation that EPA ruling caused increase in prices of fuel-efficient cars) *with id.* at 879–80 (opinion of Silberman, J.) (court may not construct theory, which petitioners never advanced, in order to establish standing).[7] Plaintiffs or petitioners have the burden of pleading facts that, if true, would confer Article III jurisdiction on the court. *Warth,* 422 U.S. at 508, 95 S.Ct. at 2210 (plaintiff "must allege specific, concrete facts demonstrating that the challenged practices harm *him,* and that he personally would benefit in a tangible way from the court's intervention.").

The dissent, in our view, correctly warns against judicial readiness to predict South African developments that lie beyond our expertise as judges. Dissent at 984. Indeed, all predictions as to political or economic trends are probably based on non-judicial skills. That is precisely why we think the dissent's willingness to create, despite petitioners' failure to advance, a theory of interconnection between Isaacs' injury and the relief sought is inappropriate. We minimize the risk that we will be drawn outside our legitimate authority by insisting, as the Supreme Court did in *Warth,* that *plaintiff* or *petitioner* precisely trace the connection between injury and

relief that is indispensable to our jurisdiction.

This is not, as our dissenting colleague suggests, an excessive judicial reliance on technical pleading requirements.[8] Petitioners' difficulty is not caused by inadequate lawyering; rather it stems from an analytical problem that is at the heart of their standing difficulty. That any of the intermediate steps that the dissent hypothesizes —"way pavers" towards the end of apartheid—would provide any concrete relief for Isaacs' specific injury, exile from South Africa, is downright speculation. It cannot be pleaded responsibly because it is essentially unknowable.

Although petitioners fail to explain how intermediate steps will aid Isaacs, it does seem substantially likely that an ending of apartheid and the concomitant complete overhaul of the South African political system would provide redress to Isaacs and other similarly situated political exiles. After all, Isaacs' exile (and Randall Robinson's persona non-grata status) is entirely based on his opposition to apartheid, and it would seem more than passing strange that a Republic of South Africa that abandoned apartheid would nonetheless remain closed to Isaacs. Therefore, we turn to petitioners' claim that the NRC's refusal to ban the importation of uranium hexafluoride has perpetuated the existence of apartheid in South Africa and therefore inflicts injury on Isaacs.

Petitioners devote their entire discussion of Isaacs' standing to arguing that enforcement of the sanctions package in the Anti–Apartheid Act is likely to lead to the end of apartheid. Their grievance in this case,

---

7. It is noteworthy that petitioners are represented by competent counsel who directed their full attention to the standing problem.

8. The dissent contends that Federal Rule of Civil Procedure 15 and 28 U.S.C. § 1653 afford petitioners the opportunity to amend defective allegations of jurisdiction. Whether or not that is true, those provisions certainly do not give the court authority, *sua sponte,* to construct petitioners' case for them. We are skeptical, moreover, whether amendments to the allegations of redressability are appropriate in this case. As one of us has said in another context, "[a] lawsuit is not a continuing dialogue with the judi-

ciary in which a party may try different theories of standing until one succeeds." *Center for Auto Safety,* 847 F.2d at 877 n. 2 (opinion of Silberman, J.). Rule 54(c), upon which the dissent also relies, does permit the court to grant relief not specifically sought, but it comes into play only after the court determines it has jurisdiction. At the outset, a federal court must determine that plaintiffs' asserted injury and their requested relief are sufficiently connected to empower the court to entertain the claims. Once jurisdiction is established and a claim is heard, Rule 54(c) permits the court to consider relief not specifically pleaded.

however, concerns *only* the failure of the NRC to ban the importation of *uranium hexafluoride*. There is no allegation that the United States is not enforcing the remainder of the sanctions. On its face it seems implausible that the marginal change resulting from the addition of an NRC ban on uranium hexafluoride to the existing sanctions will be the proverbial "straw that breaks the camel's back" and lead to the collapse of the apartheid system. And since petitioners have offered us no reason to believe that this particular sanction will have an effect of such great magnitude, we do not see how they can meet the causation test.

In support of its argument that Isaacs satisfies the causation requirement of Article III, petitioners rely principally on the decision of this court in *Diggs v. Shultz*, 470 F.2d 461 (D.C.Cir.1972), *cert. denied*, 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973). In *Diggs*, we held that Rhodesian exiles who were unable to return to their homeland had standing to challenge the authorization by the United States of the importation of metallurgical chromite from Southern Rhodesia. The petitioners in *Diggs* alleged that the importation violated the treaty obligation of the United States to comply with a United Nations embargo on trade with Southern Rhodesia. The court rejected the government's contention that "the prospects of significant relief by means of the embargo are so slight that this relationship of intended benefits is too tenuous to support standing." *Id.* at 465. The court reasoned that:

> [i]t may be that the particular economic sanctions involved against Southern Rhodesia in this instance will fall short of their goal, and that appellants will ultimately reap no benefit from them. But, to persons situated as are appellants, United Nations action constitutes the only hope....

*Id.*

Were the holding in *Diggs* binding precedent, it likely would control this case.[9] Our

reading of the Supreme Court precedent since 1970, however, leads us to conclude that *Diggs* is no longer good law on the issue of causation. The Court's opinions have undermined the analysis of the *Diggs* court because those opinions typically (if not invariably) require a demonstrable causal nexus between a pleaded injury and the allegedly illegal conduct.

In the line of cases beginning with *Warth v. Seldin*, 422 U.S. 490, 504–05, 95 S.Ct. 2197, 2207–08, 45 L.Ed.2d 343 (1975), and continuing through *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 44–46, 96 S.Ct. 1917, 1927–28, 48 L.Ed. 2d 450 (1976), and *Allen v. Wright*, 468 U.S. 737, 756–61, 104 S.Ct. 3315, 3327–30, 82 L.Ed.2d 556 (1984), the Court has placed the burden on the complaining party to show a "substantial likelihood" that the requested relief will redress the alleged injury. *See also Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 74–79, 98 S.Ct. 2620, 2630–34, 57 L.Ed.2d 595 (1978). It is clear that the pursuit of a potential avenue of redress, even if it is the "only hope," will not present a case or controversy under Article III if there is not a substantial likelihood of redressability. The "only hope" theory accepted in *Diggs* strikes us as similar to, though technically distinct from, the argument that a plaintiff should have standing if no other plaintiff would be able to enforce the law. The Supreme Court has rejected the latter contention, *Schlesinger*, 418 U.S. at 227, 94 S.Ct. at 2935, and regardless of the emotional appeal of the former, it too fails as a matter of constitutional law.

Our own decisions since *Diggs* have declined to recognize standing when the effectiveness of the relief requested depends on the unforeseeable actions of a foreign nation. In *Greater Tampa Chamber of Commerce v. Goldschmidt*, 627 F.2d 258 (D.C.Cir.1980), we held that the Greater

---

9. *Diggs* might be distinguishable on the ground that *Diggs* dealt with a total trade embargo, while petitioners in this case only challenge the NRC's decision with respect to a fraction of the sanctions package. We assume that *Diggs*

would control, however, because the "only hope" theory employed in that case seems to abandon *any* inquiry into the likelihood of redressability.

Tampa Chamber of Commerce and other appellants did not have standing to challenge the validity of an agreement between the United States and the United Kingdom regulating travel between the two countries. We believed that there was no "substantial likelihood" of redressability, because the complaint proffered "no evidence that, were the agreement renegotiated, the United Kingdom would be amenable to terms other than those of [the original agreement]." *Id.* at 263.

Similarly, in *Cardenas v. Smith*, 733 F.2d 909 (D.C.Cir.1984), we held that a nonresident alien lacked standing to sue the Attorney General for damages caused when the Swiss government froze his bank account after receiving information from the Attorney General. Recognizing that "the relief in the present case could be obtained only through the consent of the Swiss government," *id.* at 914, we reasoned that it was highly doubtful that a request from the U.S. Attorney General to release the account would have any impact on the litigation pending in Swiss courts. *See also American Jewish Congress v. Vance*, 575 F.2d 939 (D.C.Cir.1978) (even if plaintiffs had prevailed in challenging work agreement between American and Saudi governments that discriminated against Jews, independent Saudi prohibition on Jewish workers would have prevented effective relief).

Despite this steady erosion of *Diggs*, petitioners contend that the recent decision of the Supreme Court in *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), obliges us to grant standing in this case. It is argued that *Japan Whaling* discards the requirement of a substantial likelihood of redressability in cases where petitioners seek to enforce a congressional directive designed to alter the behavior of a foreign state. If petitioners were correct, that case would constitute a stunning departure from or reversal of prior jurisprudence.

In *Japan Whaling*, the American Cetacean Society brough suit against the Secretary of Commerce to compel him to certify that Japan's whaling practices "diminish the effectiveness" of the International Convention for the Regulation of Whaling, because Japan's annual harvest exceeded quotas established under the Convention. Such a certification would have required the President to impose economic sanctions against the offending nation. In a footnote, the Court stated that the American Cetacean Society had alleged a sufficient "injury in fact" to satisfy the Article III standing requirement, but it made no mention of the causation requirement in its discussion of the standing issue. 478 U.S. at 230 n. 4, 106 S.Ct. at 2866 n. 4.[10]

As the government points out, however, a close reading of *Japan Whaling* in its entirety reveals that the Court employed the traditional causation analysis, including the "substantial likelihood" requirement. Within the body of the opinion, the Court noted that "the Secretary of Commerce five times certified different nations to the President as engaging in fishing operations which 'diminish[ed] the effectiveness' of IWC quotas." *Id.* at 225, 106 S.Ct. at 2863. After each certification, "the President was able to use the threat of discretionary sanctions to obtain commitments of future compliance from the offending nations." *Id.* Quite understandably, the Court seems to have looked at past practice to assure itself that the relief sought would likely redress the claimed injury. Its entire discussion of whether certification was required thus proceeded based on the explicit determina-

---

10. The standing question inexplicably was raised before the Court only late in the process through a footnote in the reply brief of the Solicitor General. Neither the court of appeals nor the district court in *Japan Whaling* discussed the standing problem, *see* 768 F.2d 426 (D.C.Cir.1985), 604 F.Supp. 1398 (D.D.C.1985), and the petitioners failed to raise the question in their initial brief to the Court. Thus, although *Japan Whaling* does not fall squarely within the rule that "[w]hen questions of jurisdiction have been passed on in prior decisions *sub silentio,*" the precedent is not binding, *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 L.Ed.2d 67 (1984) (citation omitted), we think it appropriate to consider these circumstances when deciding whether the Court meant to announce a sharp departure in doctrine.

tion that such certification, when required, had caused foreign nations to change their behavior. In other words, causation was established.

To be sure, the Court's opinion on this point is not explicit, but we believe it is appropriate for a court of appeals to assume—when the Court does not discuss causation and redressability—that the Court followed its reigning causation analysis, rather than to infer that the Court sharply and silently departed from its own precedent. The dissent seems to believe it is our obligation to shoehorn *Japan Whaling* into prior circuit precedent (*Diggs*), rather than to try our best to read *Japan Whaling* in light of what we understand to be governing Supreme Court standing doctrine. *See supra* at 971–72. We think the dissent's approach suggests a rather unusual view of the relationship between the Supreme Court and the courts of appeal.[11]

Finally, petitioners contend that even if *Diggs* and *Japan Whaling* do not establish a different causation test in foreign sanctions cases, Congress supplied the substantial likelihood of redressability by declaring that the Anti–Apartheid Act would be an "effective means" to pressure the South African government. *See* 22 U.S.C. § 5013. We have previously struggled with the Article III implications of a con-

gressional view of the likely effect of legislation. *Compare Center for Auto Safety v. Thomas*, 847 F.2d 843, 856–57 (D.C.Cir. 1988) (opinion of Wald, C.J.) (congressional fact-finding carries "special weight" in redressability inquiry) *with id.* at 874–75 (opinion of Buckley, J.) ("Although Congress' understanding might effect the *quantum* of proof that petitioner must provide, the ultimate decision must be made by the courts."). Since, as a matter of comity, it is unseemly for a federal court to ignore such legislative opinion, we have said that Congress "can provide legislative assessments which courts *can* credit in making standing determinations," *National Wildlife Federation v. Hodel*, 839 F.2d 694, 708 (D.C.Cir.1988) (emphasis added), but we have never as a court held that we are bound to accept a congressional appraisal of the effect of its product.[12] Indeed, to do so would be to permit Congress, by legislation, to amend the Constitution.

The dissent advances an interesting, if novel, notion of deference to congressional predictions as to the effect of its legislation. It is argued that insofar as those congressional predictions coincide with our causation or redressability analysis, we are *bound* to defer to those predictions so long as they pass "the test of rationality." We should defer, according to our colleague, even as to constitutional analysis of the

---

**11.** Conceding that *Diggs* is out of step with at least some recent Supreme Court cases, the dissent suggests that if it is to be formally buried, the deed must be done by the full court *en banc*. Dissent at 983 n. 4. But, it is black letter law that a circuit precedent eviscerated by subsequent Supreme Court cases is no longer binding on a court of appeals. *See, e.g., City of Lafayette v. Louisiana Power & Light Co.*, 532 F.2d 431, 435 (5th Cir.1976) ("It is settled that the rule against inconsistent panel decisions has no application when intervening Supreme Court precedent dictates a departure from a prior panel's holding."). Moreover, *Diggs* is inconsistent with our own subsequent cases, *see supra* at 976–77, which hold that redressability is not substantially likely when relief depends on the unforeseeable actions of third countries. *Diggs* itself did not depend on deference to a congressional prediction of foreign behavior, and we address that issue separately below.

**12.** To the extent that dicta in *Animal Welfare Institute v. Kreps*, 561 F.2d 1002, 1010 (D.C.Cir.

1977), suggests that Congress can unilaterally establish the necessary causal nexus, we decline to follow it. In each case where this court has spoken of deference to congressional determinations on the causation issue, we also have been presented with independent evidence of the causal nexus. *See Kreps*, 561 F.2d at 1010 ("[T]here is also substantial factual evidence in the record of this case that South African sealing practices *will* respond to stricter enforcement of the MMPA."); *International Ladies Garment Union v. Donovan*, 722 F.2d 795, 811 (D.C. Cir.1983), *cert. denied*, 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984) ("only by taking extraordinary measures—*i.e.*, violating the law or starting new businesses overseas—could third parties prevent redress of the appellants' injuries."); *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C.Cir.1984) ("[T]hough we do not know to a certainty that the requested relief would ensure future jobs for union members …, we find such a result highly likely.").

limits of our jurisdiction, because Congress is more expert than we as to the effect of its legislation—particularly in the field of foreign affairs. That idea, to be sure, carries a certain surface appeal, but it really *de facto* seems to permit Congress to expand our constitutional jurisdiction. After all, what congressional predictions as to the impact of its legislation could be deemed irrational?

In any event, we think it unnecessary to resolve the issue that the dissent raises, for we do not believe that congressional predictions either typically or in this case answer the same analytical question that the redressability component of Article III presents to us. We must bear in mind that Congress need not meet constitutional causation standards before employing legislative power. Determining that legislation will be "effective" is not necessarily the same as determining causation for purposes of Article III. By equating the two, we think the dissent falls into an analytical snare. Congressional debates—as did the one preceding the adoption of the Anti–Apartheid Act—often focus on the relative effectiveness of proposed legislation to remedy the perceived evils, but Congress is not constitutionally obliged to demonstrate that its exercise of legislative power will have a foreseeable proximate effect on any specific individual. Congress may and does pass legislation that seeks only approximately or imprecisely and perhaps over a long period of time to affect the behavior of men and nations. Thus, we do not quarrel with Congress' judgment that the Anti–Apartheid Act will have a positive influence over time on South African affairs (the dissent in that regard seems to misunderstand our reasoning). Rather, we are un-able to conclude that our employment of judicial power is likely (let alone substantially likely) to cause an end to apartheid *so as to redress Isaacs' injury.* Moreover—and this point is decisive—we do not think our conclusion is in any way inconsistent with congressional predictions as to the effectiveness of the legislation.

As we noted above, petitioners' grievance in this case does not involve the *entire* sanctions package, but only the failure of the NRC to ban the importation of uranium hexafluoride. Whatever predictions Congress made about the effectiveness of the Anti–Apartheid Act were made with regard to the sanctions package as a whole. Congress never suggested that extending the embargo to uranium hexafluoride would lead to the end of apartheid. That point illustrates nicely that the constitutional question of causation as to the litigants before us is really of quite a different order than the largely political question of causation considered by Congress. We must ask rigorously whether our use of judicial power will remedy the particular injury suffered by a person or group of persons, and that question will rarely be the same as that which Congress addressed.[13]

Even assuming, arguendo, that the dissent is correct and the proper focus of the causation inquiry is on the full complement of economic sanctions, petitioners have failed to meet their burden. They are correct to point out that Congress sought to use "effective means to achieve the removal of ... the apartheid system." 22 U.S.C. § 5013(a). But Congress also recognized that the effect of the entire sanctions package—much less the ban on uranium alone—would be marginal,[14] and its link to

---

**13.** The dissent refers to this reasoning as "divide and conquer," because if no one part of the sanctions package is sufficiently weighty by itself then "each agency ... can henceforth claim immunity from judicial review." We do not understand this point, however, since if all agencies were declining to enforce the Act or enforcing it inadequately, then the case would be tested as an overall refusal to implement the sanctions—as in fact we do arguendo. *See infra* at 979–80. If the case is less than that—as is ours—then we do not confer standing upon petitioners by imagining another case in which we might have jurisdiction. Nor is standing conferred by judicial apprehension that otherwise the Executive Branch might be permitted arguably to violate the law.

**14.** When discussing the effectiveness of the sanctions imposed by the Act, Congress spoke in terms of "the effectiveness of U.S. sanctions in promoting, *at the margin,* nonviolent fundamental change...." H.R.Rep. No. 638, 99th Cong., 2d Sess., pt. 1, at 11 (1986) (emphasis added).

the end of apartheid would be quite attenuated. While Congress obviously believed that sanctions would be useful "in helping to bring an end to apartheid in South Africa," 22 U.S.C. § 5002, it realized that sanctions were only one of a number of independent variables that would have an impact on the situation in South Africa. Congress did not view the sanctions as a means to achieve direct and proximate relief for victims of apartheid like Isaacs. Rather, it hoped that the Act would "provide incentives for political negotiations" that might eventually lead to the end of apartheid. H.R.REP. No. 638, 99th Cong., 2d Sess., pt. 1, at 7 (1986). Just this year, in a report that petitioners cite to document the Act's effectiveness, Congress recognized that "[s]anctions cannot provide a 'quick fix.' Instead, they can constitute part of a *medium-to-long term approach* designed to maximize both internal and external pressure on the apartheid regime." H.R.REP. No. 642, 100th Cong., 2d Sess., pt. 1, at 12 (1988) (emphasis added).

The weight of Supreme Court authority emphasizes that when numerous third parties and independent variables lead to an injury, the complainant has the burden of showing that but for the particular governmental action that he is challenging, the injury would abate. *Allen*, 468 U.S. at 759, 104 S.Ct. at 3328; *Simon*, 426 U.S. at 41–42, 96 S.Ct. at 1925–26; *Warth*, 422 U.S. at 507, 95 S.Ct. at 2209. We have interpreted these cases to mean that petitioners "must show that the agency's action is more than only one of the many factors whose relative influence may affect the third parties' behavior." *Community for Creative Non-Violence v. Pierce*, 814 F.2d 663, 669 (D.C.Cir.1987). Were we to accord full weight to congressional predictions as to

the effect of the Anti–Apartheid Act, it is still highly speculative if or when the limited sanctions of the 1986 Act would lead to the end of apartheid in South Africa.[15] Although the sanctions may well induce political negotiations, we can only guess how the parties will react to that opportunity. Numerous factors, including domestic South African politics, the influence of third countries,[16] and the status of the world economy will influence negotiations if congressional sanctions are successful in prompting their initiation. We can fervently hope that the effect of the Anti–Apartheid Act will converge with all of these factors in a favorable manner to bring an early end to the odious practice of apartheid. That hope, however, does not supply a constitutional justification for the use of judicial power in this case.

Nor is jurisdiction conferred by the dissent's underlying concern that if we deny standing to these plaintiffs in this case the Executive Branch might not be adequately checked by the judiciary. *See* Dissent at 987. Article III does not confer on federal courts power to supervise generally the Executive Branch, and therefore some executive (or for that matter congressional) actions that arguably conflict with legislation may be reviewable only through the political process.

\* \* \* \* \* \*

For the reasons stated, we conclude that none of the petitioners has standing to seek review of the NRC's orders. Therefore, the petition for review is

DISMISSED.

MILTON POLLACK, Senior District Judge, concurring:

I concur *dubitante* with Judge Silberman on the issue of standing. My doubt stems

---

15. Congress itself has expressed skepticism about the potential that the 1986 Act will bring an end to apartheid. In a recent evaluation of the 1986 Act, the House Foreign Affairs Committee concluded that "[e]xisting selective and bilateral sanctions have given South Africa opportunities for evasion and adjustment, and time to prepare for further sanctions." H.R.REP. No. 642, 100th Cong., 2d Sess., pt. 1, at 12 (1988). As a result, the Committee felt that additional sanctions were needed to stimulate change in South Africa.

16. Congress has recognized that sanctions must be "as comprehensive and multilateral as possible" to be effective. H.R.REP. No. 642, 100th Cong., 2d Sess., pt. 1, at 12 (1988); H.R.REP. No. 638, 99th Cong., 2d Sess., pt. 1, at 11 (1986). Even if the President were to confer with the other industrialized democracies and encourage them to join in multilateral sanctions, the behavior of these third countries is a matter of pure speculation.

not from Judge Silberman's analysis but from the unclear status of the law in the area. The Supreme Court's cases provide inadequate guidance, and I therefore am somewhat uncertain about the proper resolution of the standing problem in this case. In light of that doubt, I write separately to show that—at least in my view—the end result would be identical on the merits, *i.e.,* petitioners would be unsuccessful.

The court owes considerable deference to the NRC's decision, which is in line with the Treasury Department's interpretation of the Anti–Apartheid Act. When the language of the statute and the legislative history do not demonstrate that Congress had a specific intent on the issue in question, the court must respect the administrator's interpretation if the choice the agency made is a reasonable one in the context of the particular statutory program. *Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Securities Indus. Ass'n v. Board of Governors,* 847 F.2d 890, 893 (D.C.Cir.1988).[1]

The interpretation of section 309 by the Department of Treasury and the NRC as not banning the importation of South African uranium hexafluoride is a plausible reading of the terms of the Act. Congress specified that it meant to ban the importation of uranium ore and uranium oxide from South Africa. Where Congress intended to prohibit the importation of not only the commodity itself, but also the commodity's derivatives and byproducts, it expressly so provided. *See* 22 U.S.C. § 5069(1) (Supp. IV 1986) (prohibiting importation of any "agricultural commodity or product or any byproduct or derivative thereof"). In section 309, Congress did not use similarly encompassing language, so the agencies were not directed to include South African uranium hexafluoride in the ban. Indeed, there might be a stronger case that the NRC had followed an impermissible construction if its ban had been more inclusive than the express words of the statute. Significantly, we were told at argument that South Africa, to date, has not manufactured within its own borders any hexafluoride for commercial exportation, and this reality makes it all the more improbable that Congress meant to address such exportation.

With regard to South African-origin uranium ore and uranium oxide that is transformed into uranium hexafluoride in other countries, the agencies reasonably concluded that uranium hexafluoride is not sufficiently similar to uranium ore or uranium oxide to be subject to the import bar. The Treasury Department has broad experience in implementing the substantial transformation doctrine in various contexts, and we defer to its decision that uranium hexafluoride is substantially transformed from uranium oxide. There is sufficient evidence from which Treasury and the NRC could conclude that uranium hexafluoride "emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process." *Torrington Co. v. United States,* 764 F.2d 1563, 1568 (Fed. Cir.1985).[2]

---

1. Petitioners contend that the court owes no deference to the NRC's interpretation, because the NRC is not charged with administering section 309 of the Act. They are correct to note that it is the law of this circuit that when an agency interprets a statute other than the one it has been entrusted to administer, its interpretation is not entitled to deference. *Department of Treasury v. FLRA,* 837 F.2d 1163, 1167 (D.C.Cir. 1988). In this case, however, the Treasury Department, which was charged with administering section 309 of the Act, already had interpreted the statute to permit the importation of South African uranium hexafluoride, 31 C.F.R. § 545.425 (1987), and the NRC explicitly purported to follow Treasury's decision. J.A. at 11, 13, 16–18.

2. Petitioners' principal argument against the NRC's decision is that a substantial transformation does not occur unless the process results in a product with a new end use. I see no binding authority that requires the agency to take that position, and, in fact, recent decisions indicate that petitioners' position is incorrect. *See Torrington Co.,* 764 F.2d at 1571 (key inquiry is not whether end use is changed but whether actual manufacturing process that causes transformation is substantial); *Ferrostaal Metals Corp. v. United States,* 664 F.Supp. 535, 541 (Ct. Int'l Trade 1987) (process that does not change end use of product can constitute substantial transformation if process results in "a change in the utility of the product").

The NRC's position and Treasury's interpretation are permissible, and the court should defer to those agency constructions. It is not the business of the court to effectuate the "policy" of the Act in the absence of statutory language or clear congressional intent that is contrary to the agency's interpretation.

RUTH BADER GINSBURG, Circuit Judge, dissenting as to standing:

While I agree with the majority that Supreme Court guidance through the standing thicket is "less than pellucid," Maj.Op. at 971, the nearest line of precedent and deference to Congress' superior judgment in foreign affairs lead me to conclude that Henry Isaacs and at least one of the organizational petitioners, TransAfrica, Inc., have standing in this case.[1] I agree with Judge Pollack, however, that the agencies in question plausibly read the Comprehensive Anti–Apartheid Act (the Act) to encompass no ban on the importation of uranium hexafluoride. For that reason, I would deny the petition for review.

### I.

"Political or ideological" as the organizational petitioners' interest may be, Maj.Op at 973, my colleagues recognize this essential point: the ban stopping individual members such as Randall Robinson of TransAfrica, Inc. from entering South Africa satisfies the injury-in-fact requirement. *See id.* I make this initial observation to underscore that such concrete injury to an organization's members can open the court's door to the organization itself, even if the organization's "principal purpose" is political or ideological. *See, e.g., NAACP*

*v. Button,* 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963) (holding that NAACP had standing to assert members' rights of free association and expression); *NAACP v. Alabama,* 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958) (holding that NAACP had standing to assert members' constitutional protection from compelled disclosure of their affiliation with the organization); *Anti–Fascist Committee v. McGrath,* 341 U.S. 123, 183–87, 71 S.Ct. 624, 654–57, 95 L.Ed. 817 (1951) (Jackson, J., concurring) (stating that organizations designated as Communist by Attorney General had standing to vindicate members' constitutional rights).

Furthermore, for the organization to have standing, it commonly suffices to point to the exposure of any member to a "distinct and palpable harm." *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) ("The association must allege that its members, *or any one of them,* are suffering immediate or threatened injury....") (emphasis added); *Animal Welfare Inst. v. Kreps,* 561 F.2d 1002, 1007 (D.C.Cir.1977) (same), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed. 2d 756 (1978). It is beyond genuine debate, as my colleagues concede, that a ban on travel to South Africa, operative against an individual because of his race, beliefs, or political expression, constitutes a palpable injury-in-fact. *See Diggs v. Shultz,* 470 F.2d 461, 464 n. 1 (D.C.Cir.1972) (holding that Rhodesia's refusal to admit several members of Congress and the leader of an anti-apartheid organization constituted injury-in-fact), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973).[2] Thus, the dispositive issue for the organizational petitioners, or at least TransAfrica, Inc., is

1. I agree that the members of Congress and Robert Chavez lack standing for the reasons stated in the Majority Opinion. *See* Maj.Op. at 970 n. 1, 973–74. It is well-settled, however, that only one petitioner need have standing to maintain this action. *See Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981).

2. Even if, as the majority contends, *Diggs* is no longer good law, *compare* Maj.Op. at 976 *with infra* n. 4, a restriction on travel directly related to an individual's employment seems at least

equivalent to the reduction of an individual's recreational use of natural resources, *see United States v. SCRAP,* 412 U.S. 669, 686–87, 93 S.Ct. 2405, 2415–16, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1972), or the impairment of his ability to watch and study whales, *see Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986), or seals, *see Animal Welfare Institute,* 561 F.2d at 1007.

the same as that for Henry Isaacs, whose "inability to return home without facing arrest and prosecution" for his political activities indisputably satisfies the injury-in-fact requirement. Maj.Op. at 974. That issue, to which I now turn, is whether the relief requested is likely to afford any redress for petitioners' injuries.[3]

## II.

Acknowledging the "absence of precise definitions" of the different components of the standing test, the Supreme Court in *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), directed lower courts to find guidance in the "developing case law" and to answer standing questions "by comparing the allegations of the particular complaint to those made in prior standing cases." *Id.* at 751–52, 104 S.Ct. at 3324–25. Confronting the divergent lines of Supreme Court precedent described in part by the majority, *see* Maj.Op. at 971–72, I am persuaded that the case that best matches the complaint before us is *Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986).[4]

In *Japan Whaling,* the Supreme Court upheld the standing of the American Cetacean Society to sue the Secretary of Commerce to force him to initiate what the Society alleged were congressionally-required sanctions against Japan for that nation's violation of international whaling quotas. Unfortunately for courts such as ours attempting faithfully to follow the High Court's lead, the Supreme Court did not address the redressability requirement in its footnote on standing. *See Japan Whaling,* 478 U.S. at 231 n. 4, 106 S.Ct. at 2866 n. 4. Apparently, the Court assumed that enforcing the sanctions Congress ordered would cause Japan to curtail its hunting of the endangered species, and thereby redress the injury to the Society's observation and study of whales.

In an effort to assimilate *Japan Whaling* to the *Warth–Simon–Allen* line, the majority searches outside *Japan Whaling*'s standing inquiry to find hints of a redressability determination elsewhere. *See* Maj.Op. at 977–78. The majority observes that several pages prior to *Japan Whaling*'s discussion of the standing issue, the Court recounted how previous threats of sanctions against various countries led to promises of future compliance with international whaling quotas; according to the majority, this establishes that the Supreme Court implicitly determined for itself that sanctions would redress the Society's injury. *Id.* It seems to me a stretch to say that the background discussion in *Japan Whaling* of past threats of sanctions constituted an independent inquiry and determination by the Court that sanctions would redress the Cetacean Society's injuries. In the context in which the Court placed the lines in question, the passage seems merely to describe *Congress'* assessment that, although the threat of sanctions in the past had "served the useful function of quietly persuading nations to adhere to the decisions of international fishery conservation bodies," 478 U.S. at 225–26, 106 S.Ct. at 2863–64 (quoting H.R. REP. No. 95–1029, p. 9 (1978)), swifter, mandatory sanctions were nonetheless in order.

---

3. I agree with the majority that "traceability" and "redressability" merge where the relief sought is merely the cessation of the allegedly illegal conduct, and that redressability analysis alone may suffice to show the causal link between the challenged action and the asserted injury. *See* Maj.Op. at 971.

4. Of this circuit's decisions, by far the closest to this case is *Diggs v. Shultz,* 470 F.2d 461 (D.C. Cir.1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973), which held that Rhodesian exiles, several members of the United States Congress, and a private citizen barred from entering Rhodesia had standing to challenge the United States' importation of metallurgical chromite from Southern Rhodesia in violation of a United Nations boycott. Although *Diggs* may appear out of step with some Supreme Court decisions, precedent is hardly so monolithic in this area as to render *Diggs* unassimilable. In fact, *Diggs* remains consonant with the most analogous precedent of this court, *Animal Welfare Institute, see infra* at 984, and of the Supreme Court, *Japan Whaling, see infra* at 983–84. Because *Diggs* retains vitality as a binding decision, it should guide this panel until overturned by the court en banc.

Unlike the majority, I resist force-fitting *Japan Whaling* into the *Warth–Simon–Allen* line. *Japan Whaling* is differently oriented; the Court could assume that Japan would respond to sanctions by reducing its whaling because Congress had reasonably determined that Japan would react that way, or else it would not have enacted the sanctions.

I am convinced that this is the most sensible reading of *Japan Whaling*. As the majority notes, the question of redressability is predictive. When Congress has determined that a certain action will achieve a given end, courts generally should defer to that judgment. Deference should be at its zenith when Congress has predicted that a foreign country will react to sanctions in a particular way, because such a prediction is outside the judiciary's expertise. So long as Congress' prediction seems plausible, courts should not speculate to the contrary.

Our court explictily adopted a rationale of this order in *Animal Welfare Institute v. Kreps,* 561 F.2d 1002 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978). In that case, we respected Congress' judgment about the effectiveness of sanctions in stopping South Africa's killing of seals:

> [W]e believe that Congress, in enacting the [statute], established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices.... This reflects a congressional decision that denial of import privileges *is* an effective method of protecting marine mammals in other parts of the world.... In the face of this congressional determination, it is impossible to conclude, as appellees urge us to, that the causal relationship is purely "speculative."

*Id.* at 1010 (emphasis in original). *See also Center for Auto Safety v. Thomas II,* 847 F.2d 843, 855–56 & n. 15 (D.C.Cir.1988) (Wald, C.J.) (giving due weight to Congress' findings that auto manufacturers'

receipt of corporate average fuel efficiency credits would diminish availability of fuel efficient cars); *National Wildlife Fed'n v. Hodel,* 839 F.2d 694, 708 (D.C.Cir.1988) ("Congress' admonitions ... regarding the need for specific [surface mining] regulations ... support[ ] the inference that a causal connection exists between deletion of regulatory specifics and adverse environmental effects."); *Autolog Corp. v. Regan,* 731 F.2d 25, 31 (D.C.Cir.1984) (deferring to Congress' finding that "exclusion of foreign flag shippers would prompt domestic shippers to exploit existing markets"); *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 811–12 (D.C.Cir.1983) ("[A]s Congress passed the [Fair Labor Standards] Act partly to provide redress to employers from unfair competition, the suggestion that effective enforcement of the Act will not have this effect directly contravenes the congressional judgment underlying the Act."), *cert. denied,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed. 2d 39 (1984).[5]

To defer to Congress' judgment in this way does not "permit Congress, by legislation, to amend the Constitution," Maj.Op. at 978, because courts are not *bound* to accept anything and everything Congress labels its findings. When the redressability inquiry involves a question of predictive fact regarding matters outside the realm of judicial expertise, however, courts should be reluctant to contradict the judgment of Congress, doing so only upon a showing that Congress' judgment does not stand the test of rationality.

This case falls within the category of cases in which deference is appropriate. Sanctions have become a familiar weapon in our nation's foreign policy arsenal (as *Diggs, Animal Welfare Institute,* and *Japan Whaling* signify), "contribut[ing] to U.S. policy goals in a number of important situations such as Rhodesia, Iran, Uganda, Chile, and Nicaragua toward the end of the Somoza regime." H.R.Rep. No. 638, pt. 1, 99th Cong., 2d Sess. 11 (1986). In enacting

---

5. The cases cited by the majority at pp. 976–77 of its opinion are not on point because they do not involve a congressional determination

that the foreign governments would react to the United States' action in a certain way.

sanctions against South Africa, Congress expected to "bring about reforms in [South Africa's] system of government that will lead to the establishment of a nonracial democracy," 22 U.S.C. § 5011(a) (Supp. IV 1986), and to "assist [the] victims of apartheid as individuals and through organizations to overcome the hardships imposed on them by the system of apartheid and to help prepare them for their rightful roles as full participants in the political, social, economic, and intellectual life of their country." *Id.* § 5013(a). Distinguishing these particular sanctions from previous ones on the basis of the court's undeferential assessment of their likely effectiveness takes judges beyond the pale of their general competence and draws the bench into the unseemly business of second-guessing Congress. I see no reason to question Congress' determination that these sanctions will induce change in South Africa—change adequate to redress, in meaningful part, petitioners' injuries.

The majority discounts the likely effectiveness of sanctions in two ways. First, it incorrectly describes the relief necessary to redress petitioners' injuries as total—*e.g.,* "complete democratization" of South Africa "and an end to apartheid." Maj.Op. at 974; *see also id.* at 979, 980. Phrasing the necessary relief in these stark, uncompromising terms sets up the conclusion that enforcing the Act will not likely redress petitioners' injuries; and it allows the majority to claim support from Congress' own recognition that sanctions are only part of a long term endeavor to advance the elimination of apartheid. *See id.* at 980. But petitioners' injuries can be alleviated by relief of a more modest character, and fastening on the ultimate objective disregards or discounts the Act's more immediate goals.

The Act seeks to promote as way pavers to the eventual end to apartheid several interim objectives, including repeal of the State of Emergency, recognition of the right to organize political parties, to express political opinions, and to participate in the political process, and commencement of negotiations with black South Africans. *See* 22 U.S.C. § 5011. It is plausible that

economic sanctions could achieve at least in meaningful part some of these interim goals. Indeed, the post-enactment report cited by the majority to support its argument that sanctions are not a "quick fix," *see* Maj.Op. at 980, found:

> [E]ven limited U.S. and Western sanctions have already had some constructive effects. These include: political benefits among the black majority ...; a contribution to the growing political ferment in ... key Afrikaner institutions ... as well as within the new independent political movement; and expressions of concern by the South African Government about the accumulating costs of trade and capital sanctions.

H.R.REP. No. 642, pt. 1, 100th Cong., 2d Sess. 13 (1988).

Progress on the way pavers seems capable of affording some relief to Isaacs by enabling him, sooner rather than later, to return home without being subject to arrest and prosecution for his political activities or to Randall Robinson by allowing him more immediately to enter South Africa. The majority places the Act's interim objectives outside its view because of a lack of specificity in petitioners' allegations. *See* Maj.Op. at 974–75. I believe, however, that the majority requires an unwarranted degree of meticulousness in petitioners' allegations. Although plaintiffs in typical standing cases can allege more precisely how the sought-after judicial action will redress their injuries, it is intrinsically more difficult to supply particulars when the injury is worked by, and the ultimate relief requires action of, a third party. Yet, just as "mere indirectness of causation is no barrier to standing, and ... an injury worked on one party by another through a third party intermediary may suffice," *National Wildlife Fed'n v. Hodel,* 839 F.2d at 705 (citing *Meese v. Keene,* 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987)), so an injury may be redressable even though the connection between judicial action and the ultimate redress is mediated by a third party's action. It is impossible to allege with *certainty* exactly how South Africa would react to the judicial order requested

by petitioners—just as it was impossible to predict *for certain* how Japan or South Africa would respond to sanctions in *Japan Whaling*,[6] *Animal Welfare Institute,* and *Diggs.* From petitioners' allegations, however, it seems to me one can fairly call it *likely* that attainment of the Act's intermediate goals will afford meaningful relief to Isaacs or Robinson. *See National Wildlife Fed'n v. Hodel,* 839 F.2d at 705 ("[A] party seeking judicial relief need not show to a certainty that a favorable decision will redress his injury. A mere likelihood will do.") (citing cases).

The majority itself assumes without any more specific allegation by petitioners that it is "substantially likely that an ending of apartheid and the concomitant complete overhaul of the South African political system would provide redress to Isaacs." Maj.Op. at 975. Why is it not also likely that recognition of the right of blacks to organize political parties, express political opinions, and participate in the political process will enable Isaacs—subject to arrest in South Africa precisely for his political activities—to return home or Randall Robinson—barred also for his political activities—to enter South Africa to meet with anti-apartheid activists? In both situations it is *possible* that for some reason the reforms in South Africa will not extend to either Isaacs or Robinson *as individuals,* but it is not necessary for petitioners to "negate every 'speculation and hypothetical possibilit[y] ... in order to demonstrate the likely effectiveness of judicial relief.'" *National Wildlife Fed'n v. Hodel,* 839 F.2d at 706 (quoting *Community Nutrition*

*Inst. v. Block,* 698 F.2d 1239, 1249 (D.C.Cir. 1983), *rev'd on other grounds,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984)); *see also Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 78, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978). Thus, the court should focus on those reforms minimally necessary to afford some redress for petitioners' injuries and most likely to result from the sanctions.[7]

Even if petitioners are "unclear" on this point, Maj.Op. at 974, however, the majority's approach runs counter to the well-accepted view that claimants should be given an opportunity to amend defective allegations of jurisdiction before being denied relief altogether. *See* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."); FED.R.CIV.P. 15(a) (providing that a party may amend its pleadings "by leave of court, and leave shall be freely given when justice so requires"); *see also Sierra Club v. Morton,* 405 U.S. 727, 736 n. 8, 92 S.Ct. 1361, 1366 n. 8, 31 L.Ed. 2d 636 (1972) (recognizing that organizational plaintiff may seek to amend its complaint to perfect standing allegation); *cf.* FED.R.CIV.P. 54(c) (instructing courts to grant relief to which a party is entitled even if the party's pleadings do not specify that relief). Thus, if the majority fails to see in petitioners' pleadings the "interconnection between Isaacs' injury and the relief sought," Maj.Op. at 975, it should at least afford petitioners the opportunity to make that connection clearer before denying them standing to pursue any claim in court.

---

6. Notably, in *Japan Whaling,* as the majority relates, the standing issue was raised only in a footnote in the Solicitor General's Supreme Court Reply Brief, *see* Maj.Op. at 977 n. 10, and was not addressed at all at oral argument. It is unclear to me, then, how the Cetacean Society in that case could have alleged with any more specificity than petitioners here precisely how judicial relief would redress its injury. Even if the Society there had addressed standing, it could not have alleged with certainty that Japan would cease whaling immediately as a result of sanctions because the previous threats of sanctions had resulted only in *promises* of *future* compliance. *See* 478 U.S. at 225, 106 S.Ct. at 2863.

7. The majority suggests that relief that is a long time coming is insufficient to support a finding of redressability. *See* Maj.Op. at 979–80. This assumption reflects a constricted view of current standing doctrine. Temporal distance does not make the causal link unreal or redress unlikely. *Cf. Autolog Corp. v. Regan,* 731 F.2d 25, 31 (D.C.Cir.1984) (" 'We are concerned here not with the length of the chain of causation, but on [sic] the plausibility of the links that comprise the chain.' ") (quoting *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 717 n. 31 (D.C.Cir.1977)); *United States v. SCRAP,* 412 U.S. 669, 688–90, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973) (recognizing standing despite attenuated line of causation).

Second, the majority limits its sights to the likely effect of only one provision of the Act rather than of the Act as a whole. *See* Maj.Op. at 975–76, 979. Yet Congress intended the (aptly named) *Comprehensive Anti–Apartheid Act* to serve as a broad, flexible framework for achieving U.S. goals in South Africa, not as a hodge-podge of separate, isolated actions. *See* 22 U.S.C. §§ 5002, 5012(c). The majority's "divide and conquer" approach renders the whole Act immune to private action to prompt enforcement: each agency or cabinet official responsible for implementing a specific part of the Act can henceforth claim immunity from judicial review simply on the ground that his action, viewed in isolation, is unlikely to bring about change in South Africa.[8]

Although the Supreme Court has rejected the contention that a plaintiff should have standing whenever no other person would have a securer footing to complain, *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974), that is not the situation here: petitioners are not alleging a "generalized interest ... too abstract to constitute a 'case or controversy' appropriate for judicial resolution," *id.;* they allege concrete, individualized harm which Congress reasonably believed would be remedied, at least in some measure, by enforcement of the Act. As *Reservists Committee* indicates, there are legislative prescriptions left to the political branches for enforcement because no individual can claim a distinct harm. It does not follow, however, that a statute with a unified objective but multiple implementing agents should be left judicially unenforceable when the several agents must each perform its charge in order to achieve the results intended by the whole Act. The proper

threshold inquiry for this court, then, is whether Congress reasonably predicted that enforcement of the Act as a whole would effect changes sufficient to alleviate petitioners' injuries.

The Comprehensive Anti–Apartheid Act represents Congress' effort to aid the black majority struggling for freedom in South Africa. Denial of standing to Isaacs and TransAfrica appears to me tantamount to questioning Congress' judgment regarding the Act's effectiveness or suggesting that Congress itself did not expect the Act to result in meaningful change. Either stance conveys an unwarranted message about congressional action in the foreign affairs realm. I would defer to Congress' informed judgment about the effect of the sanctions, and proceed to the merits of this case.

For the reasons stated, I would not erect a standing barrier to block all petitioners. However, the administrators have ruled that the Act does not ban South African uranium hexafluoride or uranium hexafluoride manufactured in other foreign countries from South African uranium ore or uranium oxide. I agree with Judge Pollack that the agencies' interpretation is plausible, even if not the one that seems to me most harmonious with Congress' large purpose.[9] I would on that account deny the petition for review.

---

**8.** Furthermore, contrary to the majority's view, banning uranium hexafluoride would not result in only a "marginal change" to the existing sanctions. Maj.Op. at 976. In 1986, South Africa earned $266 million from uranium imports to the U.S., *see* Treasury Dep't Response to Questions Submitted by House Subcomm. on Africa, July 10, 1987, at 13 (Brief of Petitioners, Addendum II–A), and most of the U.S. imports of South African-origin uranium products now

consist of uranium hexafluoride as a result of the Treasury–NRC interpretation of the Act.

**9.** I note that two bills introduced in the most recent session of Congress would amend the Comprehensive Anti–Apartheid Act specifically to include uranium hexafluoride in a sweeping ban of South African imports. *See* S. 2756, 100th Cong., 2d Sess. (1988); H.R. 1580, 100th Cong., 2d Sess. (1988).