# HUFFMAN ET AL. v. WESTERN NUCLEAR, INC., ET AL.

No. 87–645.   Argued April 27, 1988—Decided June 15, 1988

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Merrill* argued the cause for petitioners.   With him on the briefs were *Solicitor General*

*Fried, Acting Assistant Attorney General Spears, John Harrison, Leonard Schaitman, Richard A. Olderman, Eric J. Fygi, Marc Johnston,* and *Acting Solicitor General Wallace.*

*Peter J. Nickles* argued the cause for respondents. With him on the brief were *William H. Allen, Elliott Schulder, Alan A. Pemberton, Harley W. Shaver,* and *John H. Licht.**

JUSTICE BLACKMUN delivered the opinion of the Court.

Section 161(v) of the Atomic Energy Act of 1954, as amended, 78 Stat. 606, 42 U. S. C. § 2201(v), provides that the Department of Energy (DOE) shall restrict its enrichment of foreign-source uranium intended for use in domestic facilities "to the extent necessary to assure the maintenance of a viable domestic uranium industry." DOE has determined that the domestic uranium industry has not been "viable"[1] since 1983, and that the imposition of restrictions on the enrichment of foreign uranium would not assure viability. In this case we consider whether § 161(v) requires DOE to restrict the enrichment of foreign uranium, irrespective of

---

*Briefs of *amici curiae* urging reversal were filed for the Government of Australia by *Mark R. Joelson* and *Joseph P. Griffin;* for the Government of Canada by *Douglas E. Rosenthal;* for Eldorado Nuclear Limited et al. by *Robert E. Herzstein;* and for Electric Utility Companies by *Harry H. Voigt* and *Paul H. Falon.*

Briefs of *amici curiae* urging affirmance were filed for United States Senators Jeff Bingaman et al. by *Senator Pete V. Domenici;* and for the State of Arizona et al. by *Joseph B. Meyer,* Attorney General of Wyoming, and *Mary B. Guthrie,* Senior Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Robert K. Corbin* of Arizona, *Duane Woodard* of Colorado, *Hal Stratton* of New Mexico, *Brian McKay* of Nevada, and *David L. Wilkerson* of Utah.

*Charles H. Montange* filed a brief for the National Taxpayers Union as *amicus curiae.*

[1] A purist might regard the word "viable" as misused in this context. It nevertheless appears in the statute and therefore, inescapably, it and its variants are used throughout this opinion. See H. Fowler, Modern English Usage 679 (2d ed. 1965); W. Follett, Modern American Usage 344–345 (1966).

whether such restriction would make the domestic industry viable. We conclude that it does not.

## I

In 1964, as part of its efforts to move the nuclear-power industry into the private sector, Congress enacted the Private Ownership of Special Nuclear Materials Act (Act), Pub. L. 88–489, 78 Stat. 602, which amended the Atomic Energy Act of 1954 to permit privately owned utilities operating nuclear reactors also to own, for the first time, the uranium used for fuel in their reactors. At the time of the statute's enactment, DOE's predecessor, the Atomic Energy Commission (AEC), was the only entity in the world with the facilities to convert natural uranium into the enriched uranium used for fuel in commercial reactors.[2] In § 161(v), Congress accounted for this *de facto* monopoly by authorizing the AEC to offer "toll enrichment" services whereby utilities could obtain unenriched uranium on the open market and have it enriched by the AEC for a fee. It was to protect the uranium mining and milling industry from foreign competition during the period of transition from a Government-controlled market to an open one, that Congress included in § 161(v) the requirement that the AEC, in written "criteria," restrict its enrichment of foreign-source uranium for domestic use "to the extent necessary to assure the maintenance of a viable domestic uranium industry."[3]

---

[2] "Enrichment," in this context, refers to the process whereby the proportion of the fissionable isotope U–235 is increased from approximately 1% to approximately 3%. Natural, unenriched, uranium cannot be used to produce commercial electric power.

[3] The relevant portion of § 161(v) states that the AEC is authorized to offer toll enrichment services provided:

"That the Commission, to the extent necessary to assure the maintenance of a viable domestic uranium industry, shall not offer such services for source or special nuclear materials of foreign origin intended for use in a utilization facility within or under the jurisdiction of the United States. The Commission shall establish criteria in writing setting forth the terms

The criteria initially established by the AEC provided that it would enrich no foreign-source uranium for domestic use. See 31 Fed. Reg. 16479 (1966). In 1974, expecting an increase in the demand for uranium to match the anticipated expansion in the commercial use of nuclear power, the AEC amended the criteria and provided for the gradual elimination by the end of 1983 of restrictions on its enrichment of foreign-source uranium for domestic use. See 39 Fed. Reg. 38016 (1974). The phase-out took place according to schedule, and DOE, which has replaced AEC for these purposes,[4] has not reimposed restrictions on the enrichment of foreign uranium.

The early optimistic forecast for the commercial use of nuclear power turned gloomy in the late 1970's and early 1980's, and the economic condition of the domestic uranium industry deteriorated. Cancellations and delays in the construction of nuclear reactors led to a drop in the demand for uranium, which, in turn, brought about a precipitous decline in the

---

and conditions under which services provided under this subsection shall be made available including the extent to which such services will be made available for source or special nuclear material of foreign origin intended for use in a utilization facility within or under the jurisdiction of the United States: *Provided,* That before the Commission establishes such criteria, the proposed criteria shall be submitted to the Joint Committee [on Atomic Energy], and a period of forty-five days shall elapse while Congress is in session . . . unless the Joint Committee by resolution in writing waives the conditions of, or all or any portion of, such forty-five-day period." 42 U. S. C. § 2201(v).

[4] In 1974, Congress enacted the Energy Reorganization Act of 1974, 88 Stat. 1233, as amended, 42 U. S. C. § 5801 *et seq.,* which abolished the AEC. See § 5814(a). The functions of the AEC were divided between two regulatory bodies. Its "licensing and related regulatory functions" were transferred to the Nuclear Regulatory Commission. § 5841(f). All other functions, including the enrichment-services program, were transferred to the Energy and Research and Development Administration, § 5814(c), which later became DOE, see §§ 301 and 703 of Department of Energy Organization Act, 91 Stat. 577, 606, 42 U. S. C. §§ 7151(a) and 7293.

price of uranium ore.[5] The decline of the domestic uranium industry has also been attributed to other developments in the national and international markets. DOE lost its enrichment monopoly when two European consortia and the Soviet Union began to supply enriched uranium produced from foreign-source ore. See 51 Fed. Reg. 3625 (1986). This allowed foreign uranium suppliers, who offered lower prices, to compete successfully with domestic suppliers for the business of the domestic utilities. Another competitive alternative was the emergence of a secondary market in which domestic utilities, bound by long-term contracts to purchase enrichment services in excess of their needs, sold their enriched uranium to other utilities at substantial discounts. *Ibid.*

In 1983, § 170B was added to the Atomic Energy Act of 1954 to improve Congress' ability to monitor the domestic uranium industry's condition. 96 Stat. 2081, 42 U. S. C. § 2210b. This new provision required the Secretary of Energy to promulgate criteria for assessing the viability of the industry and to report to the President and the Congress annually on the industry's viability. DOE accordingly issued criteria, still in effect, see 10 CFR pt. 761 (1988), which define viability largely in terms of "the extent to which the domestic mining and milling uranium industry will be capable, at any particular time, of supplying the needs of the domestic nuclear power industry under a variety of hypothetical conditions." 48 Fed. Reg. 45747 (1983). Applying

---

[5] Between 1979 and 1986, the market price of uranium dropped from $43.25 per pound to $17.00 per pound, which an industry report suggests is well below the conventional United States producers' average cost of production. See Status of the Domestic Uranium Mining and Milling Industry: The Effects of Imports, Hearing before the Subcommittee on Energy Research and Development of the Senate Committee on Energy and Natural Resources, 97th Cong., 1st Sess., 148 (1981) (statement of Edison Electric Institute reporting drop from 1979 to 1981); 51 Fed. Reg. 27136, n. 12 (1986) (reporting 1986 price). Apparently the market price has remained low. See Weekly Metals Prices, Financial Times, June 8, 1988, p. 34, col. 1 (London ed.) (reporting price of $15.75 per pound).

these criteria, DOE reported that the industry was viable in 1983, but that one year later it was no longer viable. See S. Rep. No. 100–214, p. 9 (1987) (noting no change in viability in 1985 and no change in prospect for industry's viability in 1986).

Shortly after the Secretary first reported that the industry was not viable, he initiated a rulemaking to consider revising the criteria governing DOE's restriction of enrichment services. 51 Fed. Reg. 3624–3632 (1986). In his notice of proposed rulemaking, the Secretary specifically stated that, despite the depressed condition of the domestic industry, he proposed not to restrict the enrichment of foreign uranium because "[i]mport restrictions on foreign uranium would not assure the viability of the domestic mining and milling industry." *Id.*, at 3627.

After receiving extensive comments, the Secretary adopted final revised criteria that again did not include any restrictions on enrichment. See 10 CFR pt. 762 (1988). In response to critical comments from the domestic uranium industry, the Secretary explained: "The plain language of the statute makes clear that restrictions are not to be imposed automatically if the domestic industry is non-viable, but only if they are needed to, and in fact, will assure the maintenance of a viable domestic uranium industry." 51 Fed. Reg. 27134 (1986). Finding that the domestic industry's problems were due to "[s]tructural weaknesses," particularly the collapse in demand and the consequent inability of the market to sustain a price for uranium that enabled the industry to recover its cost of production, the Secretary concluded that restrictions on enrichment would do nothing to cure those ills. *Id.*, at 27135. Moreover, the Secretary found that, because DOE had no market power with respect to the provision of enrichment services, it could not force its enrichment customers to use domestic uranium. *Id.*, at 27138. The Secretary repeated his earlier conclusion that restrictions on enrichment services "would not assure the viability of the domestic min-

ing and milling industry," *id.*, at 27135, and, if anything, would be "counterproductive," because such restrictions would send some customers away, requiring DOE to impose heavier costs on the remaining domestic suppliers. *Id.*, at 27136.

Before the Secretary had concluded that the industry was not viable, and before he had initiated this latest rulemaking, respondents, three domestic uranium mining and milling companies, filed suit in the United States District Court for the District of Colorado against DOE and some of its officers and employees, petitioners here.[6] Respondents alleged, among other things, that DOE's failure to impose restrictions on the enrichment of foreign uranium for use in domestic facilities constituted a violation of § 161(v). App. 10–15. Respondents moved for summary judgment based on this claim,[7] arguing that two facts—that the domestic industry was not viable and that DOE imposed no restrictions on enrichment of foreign uranium—sufficed to establish their entitlement to judgment as a matter of law under § 161(v). App. 27–28. Accepting respondents' two facts, DOE submitted a cross-motion for summary judgment, arguing that § 161(v) did not require restrictions when those restrictions would not serve the statutory goal of assuring the maintenance of a viable domestic industry. App. 39.

The District Court entered summary judgment for respondents. App. to Pet. for Cert. 22a. According to the court, the statute gave DOE no discretion to determine not

---

[6] Petitioners are John S. Herrington, the Secretary of Energy; F. Clark Huffman, Sherry E. Peske, Philip G. Sewell, James W. Vaughn, and Joseph F. Salgado, officers or employees of DOE sued in their official capacities; and DOE itself. For convenience, petitioners are referred to collectively as DOE.

[7] In this motion, respondents also sought summary judgment on their claim that the criteria that DOE promulgated pursuant to § 170B to assess viability were "fatally flawed." App. 27. Respondents later sought leave to withdraw this portion of their motion without prejudice. This request was granted by the District Court. App. to Pet. for Cert. 24a.

to impose restrictions if the domestic industry was not viable. In view of its determination that immediate injunctive relief was necessary to remedy DOE's "continuing refusal to recognize its obligations under 42 U. S. C. § 2201(v)," *id.*, at 22a–23a, the District Court entered an order requiring DOE to limit its enrichment of foreign uranium for domestic use to 25% of all material enriched between June 6 and December 31, 1986; imposing a total ban on enrichment of foreign uranium beginning January 1, 1987, and "continuing until the viability of the domestic uranium industry is assured"; and calling for a rulemaking to be commenced to determine whether "criteria less restrictive than those imposed by this order would assure the maintenance of a viable domestic uranium industry." *Id.*, at 23a.

DOE appealed to the United States Court of Appeals for the Tenth Circuit.[8] That court affirmed the District Court's judgment in relevant part. 825 F. 2d 1430 (1987). The Court of Appeals found the language of § 161(v) unambiguous: The term "shall" indicated that the restrictions were mandatory, and the phrase "to the extent necessary to assure the maintenance of a viable domestic uranium industry" indicated that DOE had discretion to "determine how much restriction is required to assure viability, but it cannot decide not to impose restrictions when the industry is not viable." 825 F. 2d, at 1439. According to the Court of Appeals, the statute clearly instructs that

> "when domestic nonviability is determined, restrictions on enrichment of foreign-source uranium must be imposed and must become increasingly aggressive, to the point of 100% restriction, until the domestic industry is rejuvenated and becomes viable." *Ibid.*

---

[8] While the appeal was pending, Congress adopted a joint resolution for continuing appropriations to provide funding for DOE and other agencies. 100 Stat. 1783. Section 305 of the resolution expressly authorizes DOE to enrich foreign uranium until the present litigation is brought to final judgment. 100 Stat. 1783–210.

At DOE's request, the Court of Appeals stayed its mandate pending this Court's final disposition of DOE's petition for certiorari. App. 4. We granted the writ. 484 U. S. 1003 (1988).

## II

We begin by emphasizing that the question presented here is a narrow one which comes to us as a challenge to the entry of summary judgment. That judgment rests on a legal conclusion drawn from two uncontested facts: that the domestic uranium industry was not viable, and that DOE was imposing no restrictions on the enrichment of foreign-source uranium for use in domestic facilities. On the basis of these facts alone, the courts below determined that DOE was violating the law, for they read § 161(v) "to require the DOE to restrict enrichment of foreign uranium whenever the domestic industry is not viable—whether or not such restriction would result in successful resuscitation of the uranium industry." 825 F. 2d, at 1437. Therefore, neither DOE's underlying assessment that the industry was not viable, nor its assessment that no amount of restriction would assure the industry's viability, nor, indeed, what it means to "assure the maintenance of a viable . . . industry" are before us at this time for review. The only question presented is whether, regardless of the effects restrictions would have on the viability of the domestic industry, DOE *must* impose restrictions on the enrichment of foreign-source uranium whenever the domestic industry is determined not to be viable.

In considering this narrow question of statutory interpretation, we cannot agree with the Court of Appeals' conclusion that the relevant language in § 161(v) is unambiguous. While respondents' reading of the statute is not implausible, it is by no means the only reading the language can bear. The statute requires DOE to impose restrictions "to the extent necessary to assure the maintenance of a viable domestic uranium industry." If some amount of restriction would assure a viable domestic industry, there can be no doubt that DOE is *required* to impose restrictions. The term "shall"

makes clear that, in such circumstances, DOE has no discretion to decline to impose restrictions. But whether that mandate applies when restrictions would not assure viability is not directly addressed by the language of the statute. Indeed, we well might infer from the language that the particular issue presented by this case was not the focus of Congress' concern at the time the relevant provision was enacted. We therefore look to Congress' express purpose in imposing restriction requirements to determine whether they apply here.

The purpose of the relevant provision could not be articulated more clearly in the statutory language. See *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 543 (1940) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes"). Congress imposed restriction obligations on DOE to satisfy a single goal: "to assure the maintenance of a viable domestic uranium industry."

Both parties agree that this is the clear purpose behind the provision, but they put it to different uses. Respondents contend that the statute reveals that Congress made a policy determination that imposing restrictions on the enrichment of foreign-source uranium could *always* assure the viability of the domestic industry and therefore commanded DOE to impose some restrictions whenever the industry's viability was threatened or destroyed. Respondents suggest that DOE's refusal to impose restrictions under the circumstances presented in this case simply reflects DOE's disagreement with Congress' policy judgment. See also 825 F. 2d, at 1439 ("DOE's argument that this policy is not wise in the present uranium market should be made to Congress and not to the courts").

DOE, in contrast, asserts that the clear congressional purpose defines the proper limit of DOE's obligation: DOE is required to impose restrictions to the extent necessary to serve

a particular goal, and if *no* extent will serve that goal, then DOE does not violate the statute by declining to impose restrictions. Indeed, DOE suggests, to impose restrictions it knew were incapable of serving the statutory goal would, in fact, be to act outside its authority.

DOE's reading strikes us as the more natural one.[9] While the parties, on remand, can argue over whether DOE properly determined that no amount of restriction would assure viability, and, indeed, what it means to assure viability, it seems strained to assert that, even if DOE properly determined that no amount of restriction would assure the viability of the industry, Congress nevertheless intended DOE to impose restrictions that were somehow calculated to serve that unattainable goal.[10] Indeed, it is impossible to ascertain

---

[9] In addition to arguing that its interpretation of § 161(v) is more reasonable, DOE maintains that, even if the two interpretations are equally reasonable, its interpretation is entitled to deference as a "permissible construction" of a statute by the agency charged with the statute's administration. See *Young* v. *Community Nutrition Institute*, 476 U. S. 974, 980 (1986), quoting *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984). Although respondents contend that DOE's interpretation of § 161(v) has not been consistent over the years and is therefore not entitled to deference, see Brief for Respondents 34, it is unclear whether DOE articulated, in advance of this litigation, *any* interpretation of the statute's application to the facts presented here. On July 29, 1986, more than one month after the District Court had issued its order granting summary judgment, DOE issued a final rulemaking, stating that it would continue to refuse to impose enrichment restrictions "in order [in part] to formally record DOE's interpretation of section 161(v)." 51 Fed. Reg. 27134, n. 4 (1986). Because we agree that DOE's reading of § 161(v) is the more plausible one, we need not consider whether the manner in which DOE has articulated its interpretation should affect the degree of deference it warrants. Cf. *Securities Industry Assn.* v. *Board of Governors, FRS*, 468 U. S. 137, 143–144 (1984) (Board counsel's *post hoc* rationalizations for agency action entitled to little deference).

[10] Of course, DOE would be in a different position if Congress expressly had required that restrictions be imposed whenever the industry was not viable without tying the extent of restrictions to be imposed to the achievement of a stated purpose. Were DOE governed by such a statute, its dis-

from the statute how DOE would calculate the extent of restriction to be imposed under respondents' interpretation of the statute. The only guidepost DOE has is the amount necessary to assure the viability of the domestic industry. See 825 F. 2d, at 1438 (interpreting the phrase "to the extent necessary to assure the maintenance of a viable domestic industry" as "inform[ing] the DOE of the *amount* of restriction required") (emphasis in original). Where DOE determines that no such amount exists, it is without guidance in setting restrictions. The determination of the courts below that DOE was barred from enriching *any* foreign-source uranium rests on the assumption that the greater the restrictions, the more assured is the domestic industry's viability. This assumption cannot be grounded in the statutory language and, indeed, for the purpose of this case's summary judgment status, we must accept DOE's assertion that the assumption is false.

## III

Because we conclude that Congress did not intend to force DOE to impose enrichment restrictions where such restrictions would not achieve the statutory goal they were intended to achieve, the judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.[11]

*It is so ordered.*

---

agreement with the wisdom of the requirement would not give DOE the discretion to ignore it.

[11] While DOE styled its response to respondents' motion for summary judgment as a cross-motion for summary judgment as well as a memorandum in opposition, see App. 39, DOE's successful opposition to respondents' motion is insufficient to establish that it is entitled to summary judgment in its favor. All we have resolved here is that the industry's nonviability does not necessarily trigger an obligation to impose enrichment restrictions. Whether DOE, in fact, has violated § 161(v) by failing to impose restrictions is a question to be addressed, in the first instance, on remand after an opportunity for presentation of further evidence and further briefing.