In the Matter of the Arbitration between CHEVRON U.S.A. INC., a Pennsylvania corporation, by and through its agent CHEVRON RESOURCES COMPANY, Petitioner–Appellant,

v.

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Respondent–Appellee.

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Petitioner–Appellee,

v.

CHEVRON U.S.A. INC., Respondent–Appellant.

No. 636, Docket 88–7581.

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1989.

Decided April 14, 1989.

James N. Roethe, San Francisco, Cal. (Gerald Aksen, Christopher Connolly, Reid & Priest, New York City, David W. Trotter, Pillsbury, Madison & Sutro, San Francisco, Cal., on the brief), for petitioner-respondent-appellant.

Charles E. McTiernan, Jr., New York City (Richard J. Giglio, New York City, on the brief), for respondent-petitioner-appellee.

Before KEARSE, CARDAMONE, and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

Chevron U.S.A. Inc. ("Chevron"), petitioner in one of these consolidated actions and respondent in the other, appeals from a final judgment of the United States District Court for the Southern District of New York, Mary Johnson Lowe, *Judge*, denying its petition pursuant to 9 U.S.C. § 4 (1982) to compel Consolidated Edison Company of New York, Inc. ("Con Edison"), to submit to arbitration with respect to the price at which Chevron is contractually obligated to supply uranium to Con Edison, and granting Con Edison's petition to stay arbitration permanently. The district court found

the dispute not subject to arbitration because it was not within the parties' agreement to arbitrate. On appeal, Chevron contends principally that the district court failed to give due deference to the federal presumption in favor of arbitration. For the reasons below, we affirm the judgment.

## I. BACKGROUND

The underlying facts do not appear to be in dispute. In 1980, Con Edison entered into an agreement with Westinghouse Electric Corporation ("Westinghouse"), pursuant to which Westinghouse was to supply Con Edison with 350,000 pounds of uranium concentrate ($U_3O_8$) each year from March 1985 through February 1990 (the "Agreement"). In 1986, with Con Edison's consent, Westinghouse assigned its rights, interests, and obligations under the Agreement to Chevron. The Agreement permitted Chevron to supply Con Edison with uranium concentrate obtained from any source, domestic or foreign, unless Con Edison's use of foreign-source uranium became "restricted," in which case, Chevron would be required to supply only domestic uranium.

### A. *The Price and Arbitration Terms of the Agreement*

To the extent pertinent to the present controversy, Article IV of the Agreement linked the price at which the uranium concentrate was to be sold to the "Market Price," which was defined as

the Exchange Value published by the Nuclear Exchange Corporation ("Nuexco") in its Monthly Report to the Nuclear Industry the month immediately prior to the month of invoicing Con Edison for the U308.

Nuexco publications defined "Exchange Value" as "Nuexco's judgment of the price at which transactions for significant quanities of natural uranium concentrates could be concluded" as of the date indicated.

Article IV also contained a limited arbitration clause, stating as follows:

In the event Nuexco ceases publication of the Exchange Value, Con Edison and [Chevron] shall enter into good faith negotiations to establish a replacement method for establishing the Market Price. If Con Edison and [Chevron] cannot agree upon a replacement method within two (2) months, the replacement method will be established through the process of arbitration.... Until a replacement method for determining the Market Price is established, the Market Price shall be the last published Exchange Value and the price paid or to be paid will later be adjusted, as necessary....

### B. *The Dispute and the Decision Below*

In 1986, the market for uranium concentrate was affected by a legal development. In *Western Nuclear, Inc. v. Huffman*, Civ. No. 84–C–2315 (D.Colo. June 20, 1986) ("*Western Nuclear*"), aff'd, 825 F.2d 1430 (10th Cir.1987), rev'd, — U.S. ——, 108 S.Ct. 2087, 100 L.Ed.2d 693 (1988), the United States Department of Energy, which was responsible for "enriching" uranium, *i.e.,* causing certain of its natural properties to become more highly concentrated so that it may be used in nuclear reactors, was ordered to curtail the enrichment of uranium obtained from foreign sources. Though this decision was initially stayed by the Tenth Circuit and was eventually overturned by the Supreme Court some two years later, *see Huffman v. Western Nuclear, Inc.,* — U.S. ——, 108 S.Ct. 2087, 100 L.Ed.2d 693 (1988), the effect during the intervening period was to increase the demand for domestic uranium and to raise its price above the price of foreign uranium.

Nuexco continued to publish its Exchange Value, but as a result of this new two-tier market structure, in December 1986 it began to publish a second figure as well. Thus, along with the Exchange Value, still defined as it had been in 1980, Nuexco reported the "premium" paid for domestic uranium, *i.e.,* the amount by which the price per pound of domestic uranium exceeded the Exchange Value.

Following announcement of the decision of the district court in *Western Nuclear,*

Con Edison promptly advised Chevron that it viewed that decision as restricting Con Edison's use of foreign uranium, and it demanded that all uranium delivered thereafter be of domestic origin. Although Chevron contested Con Edison's interpretation of the *Western Nuclear* decision, it nonetheless commenced to supply Con Edison with domestic uranium. In March 1987, Chevron began to bill Con Edison at a price reflecting the Nuexco Exchange Value plus the Nuexco reported premium, stating as follows:

> It is now clear that there are *two* Exchange Values being published by Nuexco, one for foreign concentrates and the other for domestic-origin concentrates. *"The"* Exchange Value previously reflecting Nuexco's judgement of the price at which sales of significant quantities of natural uranium concentrates could be concluded *from all sources world-wide* is no longer being published.
>
> ... Chevron believes that the price should reflect the premium that Nuexco indicates domestic-origin concentrates command over concentrates from foreign sources.

(Chevron letter to Con Edison dated March 18, 1987 (emphasis in original).) Con Edison disagreed and refused to pay the portions of the bills reflecting the Nuexco premium.

Chevron demanded arbitration of the dispute. Con Edison, contending that the Agreement did not provide for arbitration in the existing circumstances because Nuexco had not "cease[d] publication of the Exchange Value," filed a petition in state court seeking an order permanently enjoining arbitration. Chevron commenced its own action in the district court, seeking an order pursuant to 9 U.S.C. § 4 compelling arbitration. Chevron removed Con Edison's state proceeding to the district court, where it was consolidated with Chevron's action.

In support of its petition to compel arbitration, Chevron submitted, *inter alia*, affidavits from an economist and from a Westinghouse employee who had participated in the negotiation of the Agreement. The economist stated his opinion that Nuexco no longer published "the Exchange Value" referred to in the Agreement, because "[t]he 'Exchange Value' no longer serves as a reliable indicator of the spot market price for *domestic-origin* $U_3O_8$ concentrates." (Affidavit of Richard J. Gilbert ¶¶ 7, 10 (emphasis in original).) The Westinghouse employee stated that the principal purposes of the Agreement had included providing Con Edison with uranium at a price linked to the "fair market value" and "provid[ing] for arbitration of a new market price method under certain circumstances." (Affidavit of Donald R. Marcucci ¶ 7.) The Marcucci affidavit stated that there had been no "contemporaneous discussions between Con Edison and Westinghouse as to how the 'Market Price' provisions of Article IV would be applied if a two-tiered market for uranium emerged in the future." (*Id.* ¶ 12.)

In opposition to the Chevron petition and in support of its own request for a stay of arbitration, Con Edison submitted the affidavit of its employee who had negotiated the Agreement on behalf of Con Edison, pointing out, *inter alia*, differences between Article IV and other provisions of the Agreement and differences between Article IV and the arbitration provisions of other Westinghouse uranium supply agreements. This affidavit noted that the Agreement made reference to a variety of third-party indices other than the Nuexco Exchange Value and made provision for negotiation of replacement of those other indices "[s]hould the indices specified ... be discontinued, *or should the basis of their calculation be substantially modified.*" (Affidavit of Henri M. Gueron ¶ 7 (emphasis added).) In addition, the Gueron affidavit appended copies of two Westinghouse contracts with other utility companies, one entered into roughly contemporaneously with the Con Edison Agreement and the other entered into a few months earlier. These contracts also had price terms linked to the Nuexco Exchange Value, but each contained an arbitration clause that was broader than the clause of the present Agreement in one significant respect: In addition to providing for arbitra-

tion in the event that Nuexco ceased to publish the Exchange Value, these other contracts provided for arbitration if "either party reasonably believes" (*id.* Exhibit C), or if both parties "agree" (*id.* Exhibit D), "that the Nuexco Exchange Value does not fairly represent the market price." (*Id.* Exhibits C, D.)

In an opinion dated June 9, 1988 ("Opinion"), the district court denied Chevron's petition to compel arbitration and granted Con Edison's petition to enjoin arbitration. After discussing the pertinent legal principles, the court observed that the Nuexco "Exchange Value is fundamentally different now than it was eight years ago when the Agreement was negotiated," and indicated that at first blush, arbitration would seem to be appropriate. The court was persuaded, however, in light of Westinghouse's explicitly broader contracts with other utility companies, that Westinghouse and Con Edison had not intended the arbitration term of the present Agreement to be triggered merely because the Exchange Value published by Nuexco might have ceased to be a fair reflection of the market price. The court concluded that the language of the other contracts,

> if it were present in the Agreement, would clearly require this Court to compel arbitration. The fact that this language is not present in the Agreement, while it is present in contracts negotiated at the same time and prior to the Agreement, leads this Court to conclude "with positive assurance" ... that the arbitration clause in the Agreement is not triggered where, as here, the Exchange Value is still being published, even though its meaning has been altered.

This appeal followed.

## II. DISCUSSION

On appeal, Chevron contends principally (1) that the district court failed to pay due deference to the federal presumption in favor of arbitration by refusing to order arbitration unless it was "clearly require[d]" by the Agreement, (2) that the court failed to consider the affidavits submitted by Chevron, and (3) that proper deference to the presumption and proper consideration of the affidavits would have required an order compelling arbitration. We disagree.

It is well-established that federal policy favors resolution of disputes through arbitration rather than through litigation. Thus, " 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... [A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration....' " *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983)); *see Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 847 (2d Cir.1987). Accordingly, the district court should compel arbitration " 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *McAllister Brothers, Inc. v. A & S Transp. Co.,* 621 F.2d 519, 522 (2d Cir.1980) ("*McAllister Brothers*") (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960)).

Application of the presumption, however, is constrained by the fact that the source of any obligation to arbitrate is the contract between the parties: "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. at 582, 80 S.Ct. at 1352. Where the parties have entered into a limited agreement to arbitrate, the district court must determine whether the dispute at hand falls within that agreement. "When 'dealing with a narrower arbitration clause, ... it will be proper to consider whether the conduct in issue is on its face within the purview of the clause.' " *McAllister Brothers,* 621 F.2d at 522 (quoting *Rochdale Village, Inc. v. Public Serv. Employees Union,* 605 F.2d 1290, 1295 (2d Cir.1979)). Thus, though even a narrow

arbitration clause must be construed in light of the presumption in favor of arbitration, the court is not free to disregard the explicit boundaries set by the agreement between the parties. *See, e.g., McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir.1988). The district court properly applied these principles to the record before it.

Though Chevron argues that the court erred "by insisting on language in the Agreement that would 'clearly require' arbitration of this dispute," we have searched the Opinion in vain for such insistence. The only portion of the Opinion that Chevron cites in support of this argument is the discussion of the other uranium supply contracts entered into by Westinghouse, which the court said would "clearly require" arbitration. That portion of the Opinion, however, followed the court's clear and correct exposition of the legal principles governing judicial interpretation of arbitration clauses. We think it plain that, in comparing the present Agreement with the other agreements, the court was simply attempting to fathom the parties' intent with respect to what type of price dispute the arbitration clause in the present Agreement would cover, in order to determine whether the straightforward language, "ceases publication," could at all reasonably be read to mean "ceases publication *or* continues publication under different circumstances." Given the court's discussion of the law, including its explicit recognition that "[a]rbitration must be compelled 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,'" Opinion at 7 (quoting *McAllister Brothers* ), we are not persuaded that the court's observation that certain disputes could be made clearly arbitrable bespoke a belief that any dispute not clearly arbitrable was *ipso facto* nonarbitrable.

As to Chevron's contention that the arbitration clause can reasonably be viewed as sufficiently broad to cover the present dispute, we disagree. The Agreement was explicit in its definition of "Market Price" as "the Exchange Value published by [Nuexco] in its Monthly Report to the Nuclear Industry." It was equally explicit—and quite narrow—in its description of the event that could trigger arbitration. Though the parties could have made provision for action if either (a) the Exchange Value ceased to be published or (b) the basis for its calculation changed, as they did with respect to other indices, instead Article IV provided only that the obligation to arbitrate would arise "[i]n the event Nuexco cease[d] publication of the Exchange Value." It is indisputable that Nuexco continued to publish "the Exchange Value" in its monthly reports to the nuclear industry and that its definition of that term did not change. What Nuexco did, in effect, was to expand its monthly report to show, as Chevron stated to Con Edison in its March 1987 letter, *"two "* values (emphasis in original). Thus, the present controversy is not the result of any cessation of publication of the Exchange Value; we have no doubt that if Chevron had continued to supply Con Edison with foreign uranium, there would be no contention that the Exchange Value no longer existed. We think it clear that the publication of the Exchange Value plus another value is not a discontinuation of publication of the Exchange Value, and that an agreement to arbitrate where no such value is published by Nuexco cannot reasonably be interpreted as an agreement to arbitrate where there are two such published values.

We reject Chevron's contention that the affidavits it presented to the district court require the contrary conclusion. Those affidavits, like most of Chevron's contentions on this appeal, largely argue the merits of the underlying price dispute and draw from Chevron's view of the merits the conclusion that the dispute must be arbitrable. To the extent that these affidavits make any factual presentation as to the parties' intent, they reach only that intent as it relates to who should prevail in the underlying dispute rather than the parties' intent to select arbitration as the forum in which that dispute should be resolved. For example, the Marcucci affidavit argued that an in-

tent to arbitrate the present dispute should be inferred from the parties' goal of assuring that the price of uranium delivered in the future would be fair. That argument, however, goes to the merits of the underlying dispute, not to its arbitrability. As to arbitrability, the affidavit as a whole provides greater support for the inference that the parties had no thought that their phrase "ceases to publish" would be interpreted to cover the publication of two values. Though the Marcucci affidavit stated that the parties intended "arbitration of a new market price method under certain circumstances," it did not state what "circumstances" the parties discussed, and it did state that there were no contemporaneous discussions as to how the provisions of Article IV would be applied if a two-tiered market for uranium emerged in the future.

We conclude that neither the language of Article IV nor the record can reasonably be read to support Chevron's interpretation that the parties intended to make arbitrable a dispute resulting from Nuexco's publication of two values for $U_3O_8$.

This conclusion does not mean that Chevron is without means to obtain an adjudication of the merits of its price dispute with Con Edison. It is free to pursue that dispute in a court action. We of course express no view as to the merits.

## CONCLUSION

We have considered all of Chevron's arguments in support of arbitrability and have found them to be without merit. The judgment of the district court is affirmed.