**DILLON FAMILY & YOUTH SERVICES, INC., Plaintiff–Appellant,**

v.

**The DEPARTMENT OF HUMAN SERVICES OF the STATE OF OKLAHOMA and Phil Watson, Director of Human Services, Defendants–Appellees.**

No. 91–6014.

United States Court of Appeals,
Tenth Circuit.

June 2, 1992.

Stephanie L. Theban, of Chapel, Riggs, Abney, Neal & Turpen, Tulsa, Okl., for plaintiff-appellant.

Howard J. Pallotta, Asst. General Counsel, Dept. of Human Services (Richard W. Freeman, Asst. General Counsel, Dept. of Human Services, with him on the brief), Oklahoma City, Okl., for defendants-appellees.

Before McKAY, Chief Judge, and TACHA and BALDOCK, Circuit Judges.

TACHA, Circuit Judge.

Plaintiff-appellant Dillon Family & Youth Services, Inc. ("DFYS") appeals an order of the district court granting defendants' motion for summary judgment and denying DFYS's motion for summary judgment. The district court ruled that the contract between DFYS and the defendants, the Department of Human Services and Phil Watson, Director of Human Services (collectively "DHS"), does not entitle DFYS to disproportionate share ("DS") payments. On appeal, DFYS argues (1) that under the plain and unambiguous language of the contract, DHS agreed to reimburse DFYS for services rendered at its residential treatment center in the same manner that DHS reimburses hospitals; (2) that because hospitals are now eligible to receive DS payments, DFYS is entitled to receive DS payments for services rendered at its residential treatment center; and (3) that federal law does not preclude DHS from making DS payments to residential treatment centers. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

DFYS operates a residential treatment center known as Shadow Mountain Institute. The Shadow Mountain Institute renders psychiatric care to persons under the age of twenty-one and has never been licensed as a hospital.

DHS is the Oklahoma state agency designated pursuant to the Medicaid Act to administer and supervise Oklahoma's Medicaid program. DHS acts as a delegate

of the Secretary of the Health and Human Services Department. As part of the Medicaid program and other medical assistance programs for the needy administered by DHS, DHS contracts with various facilities and individual providers to provide medical care, services, and room and board for eligible persons.

On May 21, 1986, DFYS entered into a contract with DHS in order to settle disputed issues between the two parties regarding a pending rate of appeal, retroactive adjustment of rates, and recoupment of erroneously paid claims. In paragraph 4 of this agreement, DHS agreed to apply to DFYS's inpatient psychiatric facility programs "the same rate reimbursement procedures and methodology as it applies to psychiatric hospitals under the Methods and Standards for Reimbursement for Inpatient Hospital Services set forth in Attachment 4.19–A to the State Plan."[1]

Based on this agreement, on April 11, 1989, DFYS submitted an application to DHS requesting DS payments for services rendered at its Shadow Mountain residential treatment center for fiscal years 1986 and 1987. DHS denied the application, stating that the Shadow Mountain residential treatment facility was ineligible to receive DS payments because the facility did not qualify as an eligible psychiatric hospital under Oklahoma's State Medicaid Plan (State Plan). DHS denied DFYS's request for reconsideration of this decision and also denied DFYS's rate appeal. DFYS filed this action in Oklahoma State District Court, and DHS removed the case to the United States District Court for the Western District of Oklahoma. The district court entered an order on November 30, 1990, granting summary judgment to DHS and denying DFYS's motion for summary judgment.

## II. DISCUSSION

We review a summary judgment under the same standard a district court applies pursuant to Rule 56 of the Federal Rules of Civil Procedure. *Osgood v. State Farm Mut. Auto. Ins. Co.*, 848 F.2d 141, 143 (10th Cir.1988). In determining whether there is a genuine issue of material fact, we view all facts and inferences in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The controversy in this case arose when Oklahoma amended its State Plan to provide DS payments for inpatient hospital services. At the time DFYS and DHS entered into their contract, the contract specifically incorporated section 4.19–A of the State Plan which did not encompass DS payments as part of the reimbursement procedures. The State Plan was subsequently amended to provide DS payments to qualifying hospitals. Thus, we must determine whether the contract obligates DHS to make DS payments to the Shadow Mountain residential treatment center.

The trial court found that the contract was clear and unambiguous. On appeal, both parties agree with this finding. In the absence of a contractual ambiguity, the trial court's interpretation of the contract presents an issue of law that we review de novo. *Nunn v. Chemical Waste Management, Inc.*, 856 F.2d 1464, 1467 (10th Cir. 1988) (citing *CMI Corp. v. Gurries*, 674 F.2d 821, 825 (10th Cir.1982)).

Oklahoma law governs our interpretation of the contract because the contract was formed in Oklahoma and because Okla-

---

1. The term "State Plan" refers to Oklahoma's State Medicaid Plan, which contains a comprehensive statement describing the nature and scope of Oklahoma's Medicaid program and giving assurances that it will be administered in conformity with the pertinent provisions of the Social Security Act, the regulations promulgated thereunder, and other applicable official issuances of the Health and Human Services. A state becomes eligible to participate in the Medicaid program and to receive federal funds by submitting a State Medicaid Plan to the Secretary of Health and Human Services for approval.

homa is the place of performance. Okla. Stat. tit. 15, § 162. We must interpret the contract "to give effect to the mutual intention of the parties, as it existed at the time of contracting." *Id.* § 152. Because the language of the contract is clear and unambiguous, we derive the intent of the parties from the plain language of the contract. *Id.* §§ 153 & 154.

The language of the contract states that "DHS shall apply to DFYS's Inpatient Psychiatric Facility programs the same rate reimbursement procedures and methodology as it applies to *psychiatric hospitals* under the Methods and Standards of Reimbursement for Inpatient Hospital Services set forth in Attachment 4.19–A to the State Plan" (emphasis added). At the time the parties entered into the contract, section 4.19–A of the State Plan established the method for calculating a *per diem* reimbursement rate for inpatient hospital services. A *per diem* rate is an all-inclusive rate for reimbursement that is established by utilizing the Medicare cost report for each individual hospital and adjusting for inflation. According to an affidavit of Sharon Neuwald, the Programs Administrator in the Medical Services Division of the Oklahoma Department of Human Services, DHS reimburses acute care hospitals under the method outlined in section 4.19–A and reimburses psychiatric hospitals and residential treatment centers under the method outlined in section 4.19–B.

An examination of section 4.19–A confirms that psychiatric facilities are reimbursed according to the methodology outlined in section 4.19–B. In 1986, the method for computing the *per diem* reimbursement rate under section 4.19–B was nearly identical to the method for computing the base *per diem* rate for acute care hospitals under section 4.19–A; the only difference was the base year utilized to establish the payment level. In 1986, section 4.19–B drew no distinction between reimbursement methods for psychiatric hospitals and residential treatment facilities. Significantly, section 4.19–A and section 4.19–B did not

refer to DS payments in any way in 1986. DS payments only became available under these sections of the State Plan as the result of post–1986 changes in federal Medicaid law.

Approximately two years after the contract was signed, Congress amended the federal Medicaid law, requiring each state's Medicaid plan to provide for DS payments to hospitals that serve a disproportionate share of low income patients with special needs. Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, § 4112, 101 Stat. 1330. Under the amendment, DS payments can be paid to hospitals that (1) qualify as "disproportionate share" hospitals, 42 U.S.C. § 1396r–4(d), and (2) meet either the "Medicaid inpatient utilization" test, *id.* § 1396r–4(b)(1)(A), or the "low income utilization" test, *id.* § 1396r–4(b)(1)(B). States were required to amend their state Medicaid plans to reflect these limitations on DS payments. *Id.* § 1396r–4(a).

Oklahoma amended its State Plan to provide for DS payments under section 4.19–A, effective July 1, 1987, and to provide for DS payments under section 4.19–B, effective July 1, 1988. The current version of section 4.19–A defines a DS payment as a "payment adjustment whereby the hospital's base per diem reimbursement rate is increased by 15% or an amount equal the percentage payment adjustment allowed under Medicare disproportionate share payment methodology, whichever is greater." A "disproportionate share payment adjustment" is now available to a "disproportionate share hospital" that meets the "Medicaid inpatient utilization" test or the "low-income inpatient utilization" test. To qualify as a "disproportionate share hospital" the hospital must have two obstetricians with staff privileges who have agreed to provide obstetric services. This requirement does not apply to (1) a hospital that has inpatients who are predominantly under age eighteen, or (2) a hospital that does not offer nonemergency obstetric services.[2]

---

**2.** Aside from providing DS payments to qualifying hospitals, the current version of § 4.19–A did not significantly alter the reimbursement

methods and standards for inpatient hospital procedures. Like the 1986 version, the current version of § 4.19–A continues to establish the

DFYS conceded at oral argument that it cannot qualify as a "disproportionate share hospital." Thus, DFYS can only base its entitlement to DS payments on paragraph 4 of the 1986 contract in which DHS agreed to reimburse DFYS's inpatient psychiatric facility programs by applying "the same rate reimbursement procedures and methodology as it applies to psychiatric hospitals...." Because section 4.19–B now provides for DS payments to psychiatric hospitals, DFYS argues that the language of the contract allows DFYS to by-pass qualifying as a "disproportionate share hospital" and receive DS payments as long as it meets the "Medicaid inpatient utilization" test or the "low-income inpatient utilization" test.

We disagree. Under Oklahoma law, "[h]owever broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." Okla.Stat. tit. 15, § 164; *see also Devine v. Ladd Petroleum Corporation*, 743 F.2d 745 at 748 (10th Cir.1984). Further, in a contract with a public officer, uncertainties should be interpreted most strongly against the private party. *Id.* § 170. The DS payment in the current version of the State Plan is a new type of reimbursement payment—a type of payment that is additional to the base *per diem* reimbursement payments provided by the 1986 and current versions of sections 4.19–A and 4.19–B of the State Plan. We agree with the district court's observation that to require DHS to pay disproportionate share payments would result in a windfall to DFYS. Looking at the language of the contract and the language of the section of the State Plan that the contract incorporates by reference, we conclude that the parties never contemplated that DFYS would be paid disproportionate share payments.

Because we conclude that the contract does not obligate DHS to make DS payments to DFYS's Shadow Mountain residential treatment center, we do not address whether such payments, if made, would violate federal law.

AFFIRMED.

McKAY, Chief Judge, dissenting:

Once again, the recently much-touted plain language doctrine has failed to be the sure and simple guide to statutory and contract interpretation that it is often touted to be. Contrast, for example, the views of the circuit panel with that of the Supreme Court in *Western Nuclear, Inc. v. Huffman*, 825 F.2d 1430 (10th Cir.1987), *rev'd*, 486 U.S. 663, 108 S.Ct. 2087, 100 L.Ed.2d 693 (1988). The differing readings of the same "plain language" in no way reflects on the bona fides of the judges. It simply illustrates that the plain language doctrine is hardly the panacea of interpretation it is often claimed to be.

In this case Dillon Family & Youth Services ("DFYS") and the Department of Human Services ("DHS") fell into a dispute about how DFYS should be compensated for its services. DHS had taken the position that DFYS did not qualify as a psychiatric hospital for purposes of reimbursement. In order to settle the dispute, the parties entered into a contract which provided that DFYS would be compensated by "the same rate reimbursement procedures and methodology as it applies to psychiatric hospitals under the Methods and Standard for Reimbursement for Inpatient Hospital Services set forth in Attachment 4.19–A to the State Plan." Thus the parties settled their dispute by linking the appellant DFYS to inpatient hospital services as set forth in Attachment 4.19–A. Nothing in the agreement or elsewhere suggests that DFYS

method for calculating the *per diem* reimbursement rate for inpatient hospital services. The only changes regarding the *per diem* rate relate to the inflation factor and indices to be utilized. Section 4.19–A continues to specify that reimbursements for inpatient hospital services in a psychiatric facility should be made according to the methods outlined in § 4.19–B.

The current version of § 4.19–B likewise does not significantly alter the method for calculat-

ing the *per diem* reimbursement rate for psychiatric hospitals and residential treatment centers. However, under § 4.19–B, psychiatric hospitals now can receive DS payments according to the methods outlined in § 4.19–A. Thus, although psychiatric hospitals and residential treatment centers both receive a *per diem* reimbursement, only psychiatric hospitals are eligible to receive a DS payment.

qualified as an inpatient hospital under Attachment 4.19–A at the time this agreement was entered. To settle their dispute, the parties simply selected a known quantity as a method for defining future payments. There is no claim that this contract was ultra vires.

Subsequent to entering into this settlement contract, section 4.19–A was amended to change some definitions and schedules of payments. DFYS, as seems perfectly plain to me, demanded payments pursuant to 4.19–A which was the guidepost the parties had selected in order to settle their dispute. Applying plain language doctrine, I cannot read the parties' own settlement agreement as anything other than a decision that in the future DFYS would be paid the same as a psychiatric hospital in accordance with section 4.19–A. One has to read additional language into the contract to suggest that DFYS was to be paid as an inpatient hospital as set forth in Attachment 4.19–A "only so long as 4.19–A is not amended." The parties did not do that. The language does not do that. Since the parties themselves chose the manner of reimbursement with specific language and with reference to a specific section of the State Plan, I see nothing in law and equity which permits us to shift the risk of their choice of settlement language from the place where they put it to some other place. The fact that the plan changes the definition of who is and who is not eligible under the plan adds nothing. It was already disputed at the time the parties entered into this plain contract whether DFYS fit the definition under the then-extant "Reimbursement for Inpatient Hospital Services set forth in Attachment 4.19–A to the State Plan." That the State may have been unwise in choosing to settle its dispute by tying DFYS to Inpatient Hospital Services set forth in Attachment 4.19–A to the State Plan does not require us to relieve them of the bargain which they struck. It was precisely to settle with a known definitional quantity in the regulation the future disputes between the parties that they entered into this contract. I don't know why it should not be enforced as it was written.

I agree with the majority that summary judgment was properly granted. My disagreement is with whether the plain language selected by the parties calls for summary judgment in favor of the opposite party than the one which the trial court selected.

It seems to me that all of the discussion about how the current section 4.19–A defines hospitals is irrelevant. Nobody disputes that if it is applied, as the parties agreed, DFYS is entitled to be compensated the same way as those hospitals which qualify without an agreement under that section of the regulations. Likewise it seems to me that any suggestion that to enforce the contract as it was written would result in a windfall misses the point of why the parties entered into the agreement in the first place—to ensure that DFYS would be compensated in ways which were disputed at the time the contract was entered into by DHS. Had the parties meant any other methodology for resolving the dispute, they simply would have defined the method of compensation under the settlement contract in terms other than incorporation by reference of the statutory standard which the State disputed DFYS was entitled to in the first place. Even after showing proper deference to interpreting uncertainties against a private party dealing with the government, it seems perfectly plain to me that the parties entered into a clear agreement that DFYS would be paid pursuant to section 4.19–A; that if so paid, DFYS would be entitled to the sums which they claim; and that the trial court's judgment should be reversed and summary judgment entered in favor of DFYS.